United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 15, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No.  03-60028

JOHN R. WILLIAMS, JOE MCQUAY,
NORMAN OLGUIN, GILBERT RODRIGUEZ,
TOM BYRD, AND STEPHEN SOTTILE

     Petitioners,

     v.

ADMINISTRATIVE REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR,

     Respondent.

Petition for Review of Final Order of the
Administrative Review Board of the
United States Department of Labor

Before REAVLEY, DAVIS and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Employees of Mason & Hanger Corporation ("Mason") sued under 42 U.S.C. § 5851 alleging they were subjected to a hostile work environment in retaliation for their whistle-blowing activities. The Administrative Review Board, United States Department of Labor ("ARB"), denied recovery to the plaintiffs. We conclude that the ARB erred in finding that the standard developed by the Supreme Court in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) was not applicable to hostile work environment cases brought under 42

-1-

U.S.C. § 5851 where no adverse personnel action was taken. However, even under the *Ellerth-Faragher* standard we conclude that the ARB did not err in denying recovery to the plaintiffs.

I.

This action arises under the employee protection provision of the Energy Reorganization Act of 1974, as amended, 42 U.S.C. §5851 (1994) ("ERA"). The six plaintiffs in this case, John R. Williams ("Williams"), Joe McQuay ("McQuay"), Norman Olguin ("Olguin"), Gilbert Rodriguez ("Rodriguez"), Tom Byrd ("Byrd"), and Steven Sottile ("Sottile") allege that the Mason & Hanger Corporation ("Mason") subjected them to a hostile work environment in retaliation for engaging in activities protected under the ERA.

Between October 1995 and November 1996 the plaintiffs worked as Production Technicians ("PTs") at the Pantex plant in Amarillo, Texas, on what was called the W55 program. The W55 program had as its purpose the disassembly of a specific type of outdated nuclear weapon. Mason owns and operates the Pantex plant in Amarillo and had contracted with the United States Department of Energy ("DOE") to run the W55 program.

In order to determine the safest, most efficient means of disassembly, scientists, engineers, and other plant experts worked initially on a dummy weapon to develop detailed procedures for disassembly of the weapon. These procedures are known as Nuclear Explosives Operating Procedures ("NEOPs"). The initial PT team,

-2-

known as the A Group, was heavily involved in formulating the W55 NEOPs. The A Group had been randomly selected because they were PTs who were immediately available to work on the W55; they had not been selected to participate in development of the W55 NEOPs based on any particular experience or qualifications. After the NEOPs were developed, the A Group proceeded to dismantle a small group of weapons called the pilot lot. While the A Group was working on the pilot lot, a second team of PTs, the B Group, received training in the W55 NEOPs using a dummy weapon. Near the completion of the pilot lot by the A Group, the B Group was brought in to join the A Group in dismantling weapons. The six plaintiffs in this case worked in the B Group.

DOE guidelines and plant policy encourage PTs to provide input regarding NEOPs development. In addition, if, in the judgment of one or more PTs, a safety issue makes it unnecessarily risky to proceed, PTs may exercise their "stop-work authority" to halt disassembly on a unit. The PTs took this authority very seriously and it was not exercised capriciously. Pantex had also established an Employee Concerns Program ("ECP") through which employees could report safety concerns or other grievances. The ECP was under the direct supervision of the plant manager in order to ensure its separation from the ususal chain of command.

According to an investigative report drafted by Pantex Plant Management ("Pantex Management"), the animosity between A and B groups began when, during training, the B Group, some of whom had

extensive experience with nuclear weaponry, requested changes to the W55 process. Those changes were approved by Pantex Management. When the A Group applied the new procedures in the W55 work bay, however, problems developed. After the B Group completed training and started work on actual weapons, they began to raise various concerns about the process itself and questioned whether some of the A Group PTs and first-line supervisors[1] failed to comply with safety guidelines. Over the course of the W55 program, Pantex Management agreed with and acted upon many of the nuclear safety concerns the plaintiffs raised.

With hostility increasing, the W55 Pantex Management arranged safety meetings with program staff from February 27-29, 1996. The meetings were held to discuss the growing concerns raised by the plaintiffs. At the last of those meetings Pantex Management scheduled a re-tooling session for the following day to address concerns raised by the B Group. After the meeting, two of the A Group PTs spoke with Kathleen Herring ("Herring"), the W55 program director, who took them to meet with plant manager William Weinreich ("Weinreich"). The A Group PTs complained that the B Group was impugning the A Group's reputation for safety.

On March 4, 1996, hostilities between the PTs culminated in a confrontation between plaintiff Williams and Renee Stone, a member

---

[1] PTs working on the W55 were subject to direction from four lower level managers - a Program Manager, an Operations Coordinator, and two Operations Managers who served as first-line supervisors.

-4-

of the A Group.  On March 6, 1996 the A Group PTs met with Pantex Management and asked that Williams be removed from the program. Pantex Management did remove Williams from the W55 program, but only on a temporary basis while an internal team investigated the cause of the hostilities.  After the internal investigation was completed, Pantex Management directed one of its managers, John Rayford ("Rayford"), to analyze the hostilities problem and recommend how it could be avoided in the future.  In April, Pantex Management acted on Rayford's report.  Specifically, they closed down W55 operations, scheduled training in effective human interaction and teamwork for the entire program staff, and conducted a line-by-line review of the NEOPs.  Dozens of changes were made to the W55 process as a result of the NEOPs review. Pantex Management also decided to separate the A and B Groups, believing separation would reduce friction.  Williams returned to the W55 program after the teamwork training and NEOPs review and, given the remedial measures taken by Pantex Management, the hostility among co-workers was less pronounced.

During the remainder of the time that the plaintiffs worked on the W55 program, May to December 1996, the focus of workplace conflicts changed from incidents among the two PT groups to incidents between the B Group and lower level management.  These exchanges usually involved disputes between the plaintiffs and first- or second-level supervisors regarding compliance with nuclear safety guidelines.

In July 1996 Williams filed an ERA complaint with the Occupational Safety and Health Administration ("OSHA") claiming that he had been subjected to a hostile work environment in retaliation for his whistle-blowing activities. In September, Mason engaged an outside consultant to conduct an investigation of several issues Williams had raised concerning the W55. That report was released in late September. Williams testified that hostility toward him increased during the investigation, and that it worsened in November after OSHA issued a decision in his favor on his ERA complaint. With the W55 program nearing completion, Olguin and Byrd were transferred to another program in early November. Williams quit work following a heated exchange with his first-line supervisor, Paul Harter ("Harter"), in late November. In early December, McQuay, Sottile and Rodriguez were ordered to perform custodial work on an interim basis before ultimately being transferred to a different weapons program.

Plaintiffs individually sought relief from Mason for the hostile work environment under the whistle-blower provision of 42 U.S.C. § 5851. In response Mason requested a hearing before an administrative law judge ("ALJ"). Pursuant to the employer's unopposed motion the plaintiff's claims were consolidated and the ALJ held an evidentiary hearing. The ALJ issued a Recommended Decision and Order denying all of the plaintiffs claims. The ARB fully reviewed the ALJ's decision and issued a Final Decision and Order which concurred with the prior result but disagreed with the

ALJ's hostile work environment analysis. Plaintiffs appealed the ARB's decision directly to this Court in accord with 42 U.S.C. § 5851(c)(1).

## II.

Appellate review of administrative decisions arising under the ERA is governed by the standard established in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 42 U.S.C. 5851(c)(1). Under that standard, the decision of the ARB will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Macktal v. United States Dep't of Labor*, 171 F.3d 323, 326 (5th Cir. 1999); 5 U.S.C. § 706(2)(A). Factual findings are subject to substantial evidence review. 5 U.S.C. § 706(2)(E). Under the substantial evidence standard, the ARB's decision must be upheld if, considering all the evidence, a reasonable person could have reached the same conclusion as the ARB. *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Agency interpretations of circuit law, however, are reviewed *de novo*. *Macktal*, 171 F.3d at 326.

## III.

Plaintiffs first argue that they have raised a valid hostile work environment claim under the ERA whistle-blower statute, and

that the ARB erred in denying that claim by applying the incorrect standard for establishing employer liability for that hostile environment.[2]  The respondent argues that the ARB used the correct standard for establishing a hostile work environment claim, but that even under the standard proposed by the plaintiffs employer Mason has no liability to the plaintiffs.

A.

The ERA prohibits employers from discriminating against any employee "with respect to his compensation, terms, conditions, or privileges of employment" because the employee engaged in protected whistle-blowing activity.  42 U.S.C. § 5851(a).  In 1992, Congress inserted into the ERA an independent burden-shifting framework to be used in determining employer liability in claims brought under § 5851.  See 42 U.S.C. § 5851(b)(3)(A); *Trimmer v. U.S. Dept. of Labor*, 174 F.3d 1098, 1101 (10th Cir. 1999).  This framework requires the employee to show, inter alia, that he suffered an adverse employment action as a result of his whistle-blowing activity.  *Hasan v. U.S. Dept. of Labor*, 298 F.3d 914, 916 (10th Cir. 2002) (finding that an employee must show he (1) engaged in protected conduct, (2) employer was aware of this conduct, (3)

_____

[2]Plaintiffs also argue that even under the purportedly incorrect standard applied by the ARB, vicarious liability for the hostile work environment does attach.

employer took adverse action because of the protected conduct).[3] Hostile work environment claims, however, generally result from discrimination that does not culminate in a tangible or adverse employment action, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998), and this case is no exception.[4] On its face this appears to be at odds with the statutory text, and we invited the parties to brief the issue of whether the plaintiffs could state a claim under the ERA for a hostile work environment that did not culminate in an unfavorable personnel action. The parties

---

[3] Section 5851(b)(3) provides that the Secretary may not conduct an investigation into the complaint "unless the complainant has made a prima facie showing that [the employee's protected activity] was a contributing factor in the *unfavorable personnel action* alleged in the complaint." 42 U.S.C. § 5851(b)(3)(A) (emphasis added). Even if the complainant makes this showing, the Secretary still cannot conduct an investigation into the complaint if the "employer demonstrates, by clear and convincing evidence, that it would have taken the same *unfavorable personnel action* in the absence of [the employees protected behavior]." 42 U.S.C. § 5851(b)(3)(B) (emphasis added). If the plaintiff survives the initial "gatekeeper" test, the case proceeds to a hearing before Secretary. *Stone & Webster*, 115 F.3d at 1572. The complainant must again demonstrate that the protected activity was a contributing factor in the *unfavorable personnel action* alleged in the complaint," except now this must be shown by a preponderance of the evidence. 42 U.S.C. 5851(b)(3)(C) (emphasis added); *Stone & Webster*, 115 F.3d at 1572; *Trimmer*, 174 F.3d at 1101-1102; *Dysert v. Sec. of Labor*, 105 F.3d 607, 610 (11th Cir. 1997). If the complainant meets this burden, the burden then shifts to the employer to "demonstrate[], by clear and convincing evidence, that it would have taken the same *unfavorable personnel action* in the absence of [the employees protected behavior]." 42 U.S.C. 5851(b)(3)(D) (emphasis added).

[4] In its alternate findings the ARB concluded that the complainants did not suffer any adverse employment action, and this conclusion has not been challenged in this appeal.

-9-

declined, and appear to agree that hostile work environment claims not involving an adverse employment action are cognizable under the ERA. Furthermore, the ARB has consistently held that hostile work environment claims are actionable under the ERA. *Williams v. Mason & Hanger Corp.*, ARB No. 98-ERA-030, ALJ Nos. 97-ERA-14 et al., slip op. at 12 (ARB Nov. 13, 2002) (hereinafter "*Williams*, ARB at __"); *Smith v. Esicorp, Inc.*, No. 93-ERA-00016, slip op. at 23 (Sec'y Mar. 13, 1996); *Marien v. Northeast Nuclear Energy Co.*, No. 93-ERA-00049, slip op. at 7 (Sec'y Sept. 18, 1995). This position has also been embraced by the Fourth Circuit. *See English v. Whitfield*, 858 F.2d 957, 963-64 (4th Cir. 1988)(comparing the language of the ERA to the identical language under Title VII).

Given the parties agreement that the ERA permits hostile work environment claims and the absence of case law or other authority to the contrary we see absolutely no reason to swim upstream on this issue, and we conclude that the ERA, 42 U.S.C. § 5851, does recognize hostile work environment actions that do not result in unfavorable personnel action.

B.

Because the § 5851 framework concerns only those situations where the retaliatory discrimination results in some adverse employment action, we are left without guidance as to the proper standard for determining employer liability in this case. The plaintiffs argue that, contrary to the decision of the ARB, the

-10-

proper standard for determining employer liability in a hostile work environment claim under the ERA is that adopted by the Supreme Court in *Ellerth*, 524 U.S. 742 and *Faragher*, 524 U.S. 775.

In its Final Decision and Order, the ARB concluded that the *Ellerth/Faragher* standard was only applicable to Title VII sexual harassment cases and not to claims brought under the ERA. The ARB held instead that the proper standard for determining employer liability in hostile work environment cases bought under 42 U.S.C. § 5851 is the less stringent standard of *Varnadore v. Lockheed Martin Energy Systems, Inc.*, 1996 WL 363346 (ARB June 14, 1996).[5] The ARB set out three reasons for reaching this conclusion: (1) the *Ellerth/Faragher* decisions suggest that the "analysis is specifically tailored to address employer liability in sexual harassment, rather than other harassment prohibited by Title VII"; (2) sexual harassment is an "especially vexing form of employment discrimination that frequently is perpetrated . . . to personally exploit the victim's presence in the workplace," as opposed to whistle-blower harassment which is intended to drive the employee from the workplace; and (3) sexual harassment often involves invasive touching which, unlike whistle-blower harassment, is usually carried out covertly. *Williams,* ARB at 54-55.

---

[5]Under *Varnadore,* an employer will be liable for a supervisors actions where (1) the supervisor's actions were forseeable or were committed within the course and scope of employment, and (2) the employer failed to respond adequately and effectively to the harassment. 1996 WL 363346 at 31.

We are unpersuaded by the ARB's reasoning. In *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), this Court applied the *Ellerth/Faragher* standard to determine employer liability where persistent racial harassment resulted in a hostile working environment for two employees. There we noted the Supreme Court's approval of appellate court attempts to harmonize standards in sexual and racial harassment cases. 214 F.3d at 626 n.13 (citing *Faragher*, 524 U.S. at 787 n.1). Numerous other circuits have also held that the *Ellerth/Faragher* standard is applicable to racial harassment cases. *See Allen v. Mich. Dep't of Corr.,* 165 F.3d 405, 411 (6th Cir. 1999); *Wright-Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1270 (10th Cir. 1998); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 n.9 (4th Cir. 2001); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999); *Hill v. Am. Gen. Finance, Inc.*, 218 F.3d 639, 641 (7th Cir. 2000); *Jackson v. Ark. Dep't of Educ.*, 272 F.3d 1020, 1024 (8th Cir. 2001).

We fail to see a legal difference between a hostile environment created because of a supervisor's animosity toward his subordinate on account of race and a hostile environment created to restrict the truth about inadequate nuclear weapons dismantling procedures--the purpose of both is to improperly remove an unwanted employee from the workplace through the use of intimidation. Indeed, in its reasons for not using the *Ellerth/Faragher* standard the ARB explicitly acknowledged this fact, stating: "Whistleblower

-12-

harassment, like race-based harassment, is a form of public ridicule and is often intended to pressure the employee to leave the workplace." *Williams*, ARB at 55. If the *Ellerth/Faragher* standard applies in a race discrimination case, there is no reason not to apply the same standard in a whistle-blower case. We therefore conclude that *Ellerth/Faragher* is the appropriate standard to be applied in this ERA hostile work environment case where the employee suffered no adverse employment action and the ARB's decision to the contrary is in error.

C.

Despite holding that the application of *Ellerth/Faragher* was inappropriate, the ARB held in the alternative that even under the *Ellerth/Faragher* standard Mason could not be held liable for the hostile work environment. *Williams*, ARB at 67 ("We thus conclude that, under the negligence standard or the Ellerth and Faragher vicarious liability standard, the evidence does not establish a basis for employer liability for the hostile work environment that resulted from co-worker and supervisory harassment on the W55 program.").

Under *Ellerth/Faragher*, a defendant can avert vicarious liability for a hostile work environment by showing that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) the harassed employee unreasonably failed to take advantage of any preventive opportunities provided

by the employer.  *Ellerth*, 524 U.S. at 765; *Casiano v. AT&T Corp.*, 213 F.3d 278, 284 (5th Cir. 2000).

The ARB concluded that Mason met both prongs of the *Ellerth/Faragher* affirmative defense. *Williams,* ARB at 67.  With respect to the first prong, i.e., whether Mason exercised reasonable care to prevent and correct promptly any harassing behavior, the evidence shows that (1) in 1995 Pantex established the Employee Concerns Program ("ECP") "as a formal system through which employees may report concerns associated with safety, . . . or reprisal for raising such concerns," (2) the ECP was independent of the ususal chain of supervisory command, (3) the ECP was in place well before the instant harassment took place, (4) and all employees were made aware of the ECP.  *Id*. at 57.  Furthermore, once Pantex Management was informed of the hostile environment in March 1996 it acted swiftly to address the situation. Specifically, Pantex Management promptly assembled an investigative team to look into the alleged hostilities and offered recommendations on how the problem might be solved.  *Id*. at 57-58. After the investigative team completed its report, Pantex Management shut down the W55 program and required the entire staff to complete forty hours of training in effective human interaction and teamwork.  *Id*. at 58.  In addition, the company conducted a line-by-line group-review of the program's safety procedures in order to ease tensions among employees.  After the W55 program was

-14-

restarted, Pantex ordered a follow-up investigation into the hostilities and found that hostilities had reduced significantly. *Id*. at 60. Finally, Pantex Management ordered a root-causes analysis be performed, which resulted in the publication of written guidelines for supervisors on avoiding future hostility. *Id*. at 58-59. The ARB found these procedures and the response of Pantex Management sufficient to meet the first part of the *Ellerth/Faragher* defense.

The ARB also concluded that Pantex met the second aspect of the *Ellerth/Faragher* defense, i.e., the plaintiffs unreasonably failed to take advantage of preventive opportunities provided by Pantex. The ARB found that the harassment started as soon as, and maybe prior to, the plaintiffs' arrival "on line" with the W55 program on February 6, 1996; however, none of the plaintiffs filed a harassment complaint with the ECP or proceeded through any other channels until one month later on March 6, 1996. *Id*. at 57. The ARB further found that after Pantex restarted the W55 program in May of 1996 no instances of recurrent harassment were reported to Pantex Management through the ECP or any other channels until the plaintiffs filed their ERA complaints in November 1996. *Id*. at 60.

After reviewing the record and the detailed findings of the ARB, it is clear to us that the decision of the ARB is supported by substantial evidence. The plaintiffs failed to promptly notify Pantex Management of the problems they were having in the W55

-15-

program and, as seen above, Pantex Management immediately and effectively responded to the problem when finally notified. We do not see what else Pantex Management could have reasonably done to prevent or remedy the situation short of permanently removing one of the groups, an action that would surely have opened Pantex and Mason to liability. For these reasons, the ARB did not err in concluding that Mason is entitled to the *Ellerth/Faragher* affirmative defense and in denying recovery to the plaintiffs on their ERA hostile work environment claims.

IV.

Plaintiffs Williams and Sottile argue that the ARB erred in denying their respective ERA claims of constructive discharge and failure to promote. In order to prevail on these claims under the ERA the plaintiffs must show that (1) they engaged in protected conduct; (2) the employer was aware of this conduct; (3) they suffered an adverse employment action; and (4) their protected activity is likely the reason for the adverse action. *Hasan*, 298 F.3d at 916.

A.

As support for his constructive discharge claim, Williams offers two incidents that took place on November 26 and 27, 1996. The ARB found that on November 26 supervisor Harter became angry when Williams joined with McQuay in reporting a safety issue involving a crushed detonator cable. The ARB further found that on

November 27 Williams was stopped and questioned about the crushed cable by a DOE representative, which caused him to be late for a meeting with Harter. *Williams,* ARB at 67-69. Upon learning Williams had been talking to a DOE representative, Harter became very angry and harassed Williams. Williams responded by quitting. *Id.*

To demonstrate the adverse employment action element of a constructive discharge claim under the ERA the "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." *See generally Hasan*, 298 F.3d 916; *and see Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Establishing a constructive discharge claim requires proof of a work environment that is more offensive than that required for establishing a hostile work environment claim. *Brown,* 237 F.3d at 566. Except in extraordinary circumstances, employment discrimination should be addressed within the existing employment relationship. *Boze v. Bransetter*, 912 F.2d 801, 805 (5th Cir. 1990).

Despite the contentiousness of the late November encounters between Williams and Harter the ARB found that the evidence did not support a finding that Williams's working conditions were so intolerable that he could have reasonably felt that he had no other choice but to resign. *Williams*, ARB at 69. There is uncontradicted evidence showing that Williams's working conditions

-17-

had improved markedly in the weeks preceding the November 27 incident and that almost no harassment had been directed at Williams during October and November. *Id.* at 68. Moreover, there is no indication that the situation with Harter was any more egregious than those previously suffered by Williams, which did not result in his resignation. Finally, after learning of Williams's resignation plant manager Weinreich wrote Williams asking him to reconsider his decision and offering to meet with Williams and address his grievances. *Id.* at 69.

In sum, we agree with the ARB that Williams could have reasonably and effectively handled this incident in several ways short of resignation. The ARB's conclusion that Williams was not constructively discharged is therefore supported by substantial evidence.

B.

In support of his failure to promote claim, Sottile argues that in the summer of 1996 he timely applied and was qualified for an open position as an operations manager for production activity at Pantex. He was scheduled to be interviewed by the section supervisor, David Cole ("Cole"), but just before the interview he was informed that the position had been filled. Sottile argues that Cole's action was motivated by retaliation because Cole had been implicated in the instant hostile work environment claim. Sottile avers that his years of high-level managerial experience as

-18-

a Chief Petty Officer in the Navy made him much more qualified for the position than the applicant who was selected, who had significantly less supervisory experience.

To meet the adverse employment action element of an ERA failure to promote claim the plaintiff must show (1) that he applied and was qualified for a job for which the employer was seeking applicants; (2) that he was rejected; and (3) that after his rejection the position was filled by an applicant with similar qualifications or remained open and the employer continued to seek similarly qualified applicants. *Hasan*, 298 F.3d at 916-917.

It is undisputed that Sottile applied for the position, was qualified, and was rejected. However, although Sottile's experience in the Navy may have made him qualified for the position, this fact does not show the candidate selected had qualifications equal to those of Sottile. Considering that the position was filled by a supervisor from another division at the Pantex plant with important managerial experience over a similar program, the ARB was justified in finding that Sottile was rejected in favor of a clearly better qualified candidate. Accordingly, Sottile has not established that he suffered an adverse personnel action as a result of his rejection and the ARB did not err in rejecting Sottile's failure to promote claim.

## VI.

For the reasons stated above, the ARB erred in not using the

*Ellerth/Faragher* standard in this hostile work environment claim brought pursuant to 42 U.S.C. § 5851. Nevertheless, we conclude that the judgment of the ARB denying recovery to the plaintiffs on their hostile work environment claim is proper and should be affirmed. We further conclude that the ARB did not err in denying plaintiff Williams's constructive discharge claim and plaintiff Sottile's failure to promote claim.

    AFFIRMED