# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 22, 2008

Charles R. Fulbruge III
Clerk

No. 06-60849

———

PATRICIA ALLEN; LAURA WALDON; DANA BREAUX

Petitioners

v.

ADMINISTRATIVE REVIEW BOARD, UNITED STATES DEPT OF LABOR

Respondent

———

Petition for Review of an Order
of the United States Department of Labor

———

Before JONES, Chief Judge, and DeMOSS and STEWART, Circuit Judges.

DeMOSS, Circuit Judge.

Patricia Allen, Dana Breaux, and Laura Waldon ("the Petitioners") filed a Sarbanes-Oxley ("SOX") whistleblower complaint against their employer, Stewart Enterprises, Inc. ("Stewart"). They claim that Stewart retaliated against them for engaging in protected activity, created a hostile work environment, and then terminated them through inclusion in a company-wide reduction-in-force ("RIF"). After a hearing on the merits, the Administrative Law Judge ("ALJ") dismissed the Petitioners' complaint. On appeal, the Administrative Review Board ("ARB") affirmed the ALJ's decision, which constituted the final order of the of the Secretary of Labor ("Secretary"). The Petitioners filed a timely petition for review of the Secretary's final order with

this Court. Because we conclude that the Petitioners did not engage in protected activity, we affirm.

## I. Factual Background

Allen, Breaux, and Waldon are former employees of Stewart, a publicly-traded company that has been in the funeral home and cemetery business for over 90 years. Stewart is headquartered in New Orleans and has four operating divisions: Eastern, Central, Southern, and Western. The company also has a Corporate Division in New Orleans, which consists of employees working at the corporate office and employees working at the Shared Services Center ("SSC"). Much of the accounting and financial data generated by the SSC is reported to the Securities and Exchange Commission ("SEC").

Stewart employed Allen and Breaux as Quality Assurance Representatives ("QAs"). QAs served as a liaison between the four operating divisions and the SSC. Although Allen worked for the Central Division and Breaux for the Eastern Division, both employees were based in New Orleans and worked together. Waldon was Director of Administration ("DOA") for the Central Division. As the DOA, Waldon was responsible for managing Funeral Security Plans ("FSP") in Kansas City, as well as supervising three Records Management Centers ("RMCs"), which were located in Kansas City, Dallas, and New Orleans.

### A. AS400 Interest Calculations

Stewart uses the AS400 computer system ("AS400") to calculate balances for customer accounts. In late 2000, during an internal audit of cash receipts, Stewart discovered a malfunction in its computer system for calculating interest when customers prepaid their installment contracts for services or merchandise to be provided in the future. The AS400 did not correctly calculate interest in quoting the amount the customer owed, and thus many of these "payoff" amounts were erroneous. The AS400 only calculated interest correctly when a customer paid the full amount on the due date. Upon discovering the error,

Stewart immediately began working on a new computer program to calculate interest. Further, to remedy the error, Stewart's Special Projects group, a division under the SSC headed by Patricia Beatty, performed manual amortizations on all accounts that showed credit balances with a history of pre-payments on principal.

Beginning in April 2003, all three Petitioners expressed concerns to their supervisors about the faulty functioning of the AS400. As QAs for the Eastern and Central Division, Allen and Breaux were responsible for gathering supporting data needed to resolve certain issues involving customer refunds. Allen and Breaux complained that Special Projects, which performed the manual amortizations, was uncooperative and unresponsive in handling adjustments that Allen, Breaux, and Waldon submitted to correct overcharged accounts. Moreover, when they submitted an adjustment to Special Projects to correct an AS400 interest calculation problem, Beatty told them that these errors would be charged to their division on the contract error reports issued monthly for each division. Allen and Waldon testified that these errors were linked to their overall performance records and bonuses, and they believed that they were being penalized for their protected activity of pointing out these errors.

The Petitioners testified that they never thought that Stewart intentionally programed the AS400 to overcharge customers. They knew that Special Projects was performing manual amortizations as an internal control until the computer problem was fixed. Although the Petitioners knew that Stewart was actively working on a solution for the problem, they believed that Stewart was taking too long to fix the problem and the delay was due to Stewart's desire to keep the problem a secret. All three Petitioners were concerned that Stewart might be overcharging customers who did not complain and that the refunds were incorrectly calculated.

Allen and Breaux met separately with Beth Schumacher, Stewart's Director of Internal Audit. They complained to Schumacher that the SSC personnel were "stonewalling" their efforts to accomplish their work. They also complained about the SSC's failure to communicate with the QAs, the untimely refunds, and the inaccurate interest calculations. Breaux told Schumacher that she was concerned about manual amortizations and that the RMCs should have an amortization schedule so they could do their own amortizations.

Correcting the AS400 problem was listed as one of the goals in Stewart's strategic plan for 2002-03. In June 2003, the QAs convened a quality assurance conference in Dallas, at which both Breaux and Allen discussed the interest calculation problem, refund requests, and payoffs with field office directors. Stewart sponsored the conference and paid for the attendees' travel and lodging expenses.

B. Untimely Refunds

Special Projects, which calculated refunds and payoffs, had a significant backlog. In the Central Division, Special Projects took four to six weeks to calculate refunds. Allen, Breaux, and Waldon testified that they believed that delayed refunds exposed the company to litigation from customers that could thereby affect shareholders. They were particularly concerned that the delayed refunds violated Missouri and Texas state law requirements that refunds be issued within 30 and 15 days, respectively. They were afraid that this delay could lead to state sanctions, including revocation of Stewart's license, which would adversely affect shareholders.

C. Pending Other Source ("POS") Accounts

Allen and Breaux were also concerned about Stewart's POS system and reported their concerns to Beatty and the CFOs. Stewart's POS accounts are accounts that a third party, such as an insurance company, pays fully or partially. In situations where the customer paid his or her part of the account

4

balance, but the third party did not pay its part, the customer would receive a statement showing a zero balance. Allen and Breaux believed that this POS billing system made it difficult for the company to collect the unpaid balance from the customer and would affect revenue if the other source did not pay the balance. Stewart managers, however, testified that the POS billing system did not prevent the company from collecting the balance because customers with these accounts were contractually obligated to pay any amount not paid by the third party, and the company used collection agencies to collect from customers who refused to pay.

D.    SAB-101 Compliance

In 2000, the SEC staff issued Staff Accounting Bulletin 101 ("SAB-101"), which prohibits publicly-traded companies from recognizing sales revenue before they deliver merchandise to the customer. Prior to this bulletin, Stewart had recognized revenue at the time of sale. SAB-101 required that Stewart change its accounting practice and recognize revenue at the time Stewart actually delivered merchandise.

After reviewing internal accounting reports and speaking with Beau Royster, head of internal audit, Waldon became concerned that Stewart was not complying with SAB-101. Waldon was aware that Stewart did not submit these internal accounting reports to the SEC, but she was concerned that the company was overstating its gross profit. She later discovered that the company was making adjustments for SAB-101 compliance.

Waldon discussed her concerns about SAB-101 compliance with Mike Hymel, Stewart's Chief Accounting Officer, who assured her that Stewart was working on making adjustments to its system for fiscal year 2003. Waldon did not ask Hymel about SAB-101 compliance for fiscal years 2001 and 2002.

The internal consolidated financial statements for the Central Division are not the statements submitted to the SEC, but rather working documents for

managers to compare costs from year to year. According to Hymel, this internal document did not contain the SAB-101 "top-side adjustments." Budde testified that in fiscal year 2001, which commenced November 1, 2000, Stewart began making SAB-101 adjustments to the documents it submitted to the SEC. Waldon does not believe the improper recording of costs was done intentionally by Stewart, but she does believe that understating costs will result in an overstatement of the company's gross profit, thus misleading shareholders.

E.   Workspace Relocation and "Stonewalling" by the SSC

Allen, Breaux, and DoCampo (the Southern District QA), testified that the QA department work spaces were moved at least four times during their employment. In October 2003, Stewart moved the QA department work spaces from the fourth to the first floor of the SSC office building to make room for employees moving in as a result of the relocation of corporate offices to the SSC in New Orleans. Due to extensive construction at the SSC building, many other employees were also moved around. According to the Petitioners, their new work space location was temporary, and their cubicles were not a standard size, did not have proper lighting, and were located next to a storage area.

Allen, Breaux, and Waldon testified that after raising their concerns about Stewart's accounting practices, they began to experience stonewalling and resistance from the SSC, exclusion from emails and meetings, lack of notification of policy and procedural changes, and delays in receiving responses from the SSC. The Petitioners argue that Stewart subjected them to a hostile work environment for engaging in protected activity.

F.   Reduction-in-Force ("RIF")

In December 2003, after experiencing several years of declining revenue and decreasing earnings per share, Stewart announced a company-wide RIF. Bill Rowe, Stewart's Chief Operating Officer, testified that he asked each division president to determine the positions within their divisions to be

included in the RIF, but he told them that their RIF decision should not have any impact on the quality of service provided to customers. As part of the RIF, Stewart sought to cut 300 jobs, which would result in a cost savings of approximately $10 million. The company did not give the division presidents any written criteria to assist them in making their RIF decisions. Three division presidents testified that they focused on administrative positions that did not impact customer service, and they looked at job functions rather than the individuals in the jobs. The Petitioners, in contrast, argue that Stewart selected them for the RIF because they had complained about the firm's accounting practices.

The presidents of the Eastern and Central Divisions decided to eliminate the QA position because it was an administrative support position that did not directly affect customers. The Western Division president did not eliminate the QA position because he considered it to be essential to the Western Division's operating and training needs. The Western Division QA was based in California rather than New Orleans and had different duties than the QAs in the other divisions. Allen, Breaux, and DoCampo were among the approximately 300 employees included in the RIF.

The last day of employment for RIFed employees was December 3, 2003. Because the RIF involved a restructuring of the company, Stewart added 150 new positions between November 25, 2003 and January 28, 2004, and Stewart provided a job hotline so that RIFed employees could inquire about the new positions. Many employees applied for jobs and were rehired. Allen and Breaux did not use the job hotline or apply for any of the new positions in the company. Since the RIF was undertaken, Stewart's financial performance has improved.

Waldon was the Central Division's DOA, and she was not on Central Division's original RIF list. As a result of the proposed restructuring, Waldon understood that many of the functions that she oversaw would either be

eliminated or transferred to the SSC, and many of the people that she supervised would be included in the RIF.

Concerned about her job security, Waldon asked Schumacher on October 23, 2003 whether she would continue to have a job at Stewart. Schumacher told Waldon that she believed that Waldon's position would be eliminated in the future, but it would not be included in the initial RIF because Waldon's skills were valued and she would be needed to assist with the transition after the RIF. Schumacher offered Waldon a position in a training capacity in Kansas City at a substantially lower pay than the QA position, but she refused to accept it.

On November 5, 2003, Waldon told Schumacher that she would resign with two weeks notice if the company did not meet the following list of demands: notice of her termination date, consideration for out-of-pocket expenses she incurred while she was residing in New Orleans, and assurances that she would receive her fiscal year 2003 bonus, her pro-rata bonus, and a severance plan.

After several e-mail exchanges, Schumacher emailed Waldon a draft separation agreement on November 25, 2003. On November 26, 2003, Waldon's name was added to the Central Division's RIF list. At the suggestion of Waldon, Schumacher made changes to the draft separation agreement and emailed the second draft to Waldon on December 2, 2003. Although Waldon never signed and returned the second draft, Schumacher still believed that she and Waldon had reached an agreement that Waldon would stay with the company through January 31, 2004. Waldon, however, did not believe that she had reached an agreement with the company. Stewart paid for the cancellation of Waldon's apartment lease in New Orleans, paid her 2003 bonus and paid for the expenses of her one business trip to New Orleans, all of which Waldon had requested in her original demands. Waldon worked through the January 31, 2004 deadline contained in the second draft separation agreement and received the benefits of the RIFed employees. Schumacher and Crane testified that Waldon would still

be employed as the DOA if she had not forced the issue of her separation and made her various demands. According to Crane, Waldon made a verbal agreement with Shumacher to leave Stewart voluntarily.

## II. Analysis

### A. The SOX Whistleblower Statute

Section 806 of SOX, codified at 18 U.S.C. § 1514A, creates a private cause of action for employees of publicly-traded companies who are retaliated against for engaging in certain protected activity. Section 1514A(a) states, in relevant part:

> No [publicly-traded company] . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A(a)(1)(C). An employee must file a complaint with the Secretary no later than 90 days after the date on which the alleged violation occurred. Id. § 1514A(b)(2)(D).

The legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b), govern SOX whistleblower actions. 18 U.S.C. § 1514A(b)(2)(C). To

prevail, an employee must prove by a preponderance of the evidence[1] that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action;[2] and (4) the protected activity was a contributing factor in the unfavorable action.[3] 49 U.S.C. § 42121(b)(2)(B)(iii); Stojicevic v. Arizona-American Water, ARB Case No. 05-081, 2007 WL 3286331, at *7 (ARB Oct. 30, 2007); Welch v. Cardinal Bankshares Corp., ARB Case No. 05-064, 2007 WL 1578493, at *5 (ARB May 31, 2007); see Reyna v. ConAgra Foods, Inc., 506 F. Supp. 2d 1363, 1380 (M.D. Ga. 2007); see also 29 C.F.R. § 1980.104(b)(1)(i)-(iv).

If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv). This "independent burden-shifting

---

[1] The employee is entitled to the relief provided by § 1514A(c) "only if the [employee] demonstrates that [her protected activity] was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(iii). The term "demonstrates" means to prove by a preponderance of the evidence. See Dysert v. Sec'y of Labor, 105 F.3d 607, 610 (11th Cir. 1997) (addressing analogous statutory burden-shifting framework under the Energy Reorganization Act of 1974 ("ERA")).

[2] In AIR 21 cases, the ARB has adopted the definition of "adverse employment action" set forth in the recent Supreme Court case of Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006). See Hirst v. Southeast Airlines, Inc., ARB Case No. 04-116, 2007 WL 352447, at *4-*5 (ARB Jan. 31, 2007) (AIR 21 case) (using the term "adverse employment action" and "unfavorable personnel action" interchangeably). Burlington held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from [engaging in the protected activity]." 126 S. Ct. at 2415 (internal quotation marks and citations omitted). Based on the similarity of the whistleblower protections afforded under SOX and AIR 21, we find that the Burlington definition of "unfavorable personnel action" applies to SOX whistleblower claims. Compare 18 U.S.C. § 1514A(a) (SOX protections), with 49 U.S.C. § 42121(a) (AIR 21 protections).

[3] A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." Klopfenstein v. PCC Flow Techs. Holdings, Inc., ARB Case No. 04-149, 2006 WL 3246904, at *13 (ARB May 31, 2006) (quoting Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

framework" is distinct from the McDonnell Douglas burden-shifting framework applicable to Title VII claims. See Williams v. Admin. Review Bd., 376 F.3d 471, 476 (5th Cir. 2004) (ERA case); see also Trimmer v. U.S. Dep't of Labor, 174 F.3d 1098, 1101 (10th Cir. 1999) (ERA case).

If the employee files a timely petition for review of the ARB's decision, our review is governed by the standard established in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 49 U.S.C. § 42121(b)(4)(A); 29 C.F.R. § 1980.112(a). Under that standard, the decision of the ARB will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Williams, 376 F.3d at 475 (quoting Macktal v. U.S. Dep't of Labor, 171 F.3d 323, 326 (5th Cir. 1999)). Factual findings are subject to substantial evidence review. Id. at 475-76. "Under the substantial evidence standard, the ARB's decision must be upheld if, considering all the evidence, a reasonable person could have reached the same conclusion as the ARB." Id. at 476. Substantial evidence is "more than a mere scintilla but less than a preponderance." Id. (internal quotation marks omitted). The ARB's conclusions of law are reviewed de novo. Id.

B.    The Petitioners did not engage in protected activity.

Both the ALJ and the ARB concluded that the Petitioners did not engage in protected activity. We agree with the ARB's legal conclusion that an employee's complaint must "definitively and specifically relate" to one of the six enumerated categories found in § 1514A: (1) 18 U.S.C. § 1341 (mail fraud); (2) 18 U.S.C. § 1343 (wire fraud); (3) 18 U.S.C. § 1344 (bank fraud); (4) 18 U.S.C. § 1348 (securities fraud); (5) any rule or regulation of the SEC; or (6) any provision of federal law relating to fraud against shareholders. See Platone v. FLYI, Inc., ARB Case No. 04-154, 2006 WL 3246910, at *8 (ARB Sept. 29, 2006) ("[A]n employee's protected communications must relate definitively and specifically to the subject matter of the particular statute under which protection is

11

afforded.") (internal quotation marks omitted); see also Harvey v. Home Depot USA, Inc., ARB Case No. 04-114, 2006 WL 3246905, at *11 (ARB June 2, 2006) ("[A]n employee's complaint must be directly related to the listed categories . . . .").

SOX prohibits a publicly-traded company from retaliating against an employee who reports information to a supervisor "regarding any conduct which the employee reasonably believes constitutes a violation" of one of the six enumerated categories. 18 U.S.C. § 1514A(a)(1). We agree that an employee's reasonable belief must be scrutinized under both a subjective and objective standard. See Welch, 2007 WL 1578493, at *7; see also Burlington, 126 S. Ct. at 2415 ("An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."). The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee. See Welch, 2007 WL 1578493, at *7; see also Melendez v. Exxon Chems. Ams., ARB Case No. 96-051, slip op. at 27 (ARB July 14, 2000). Importantly, an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected. See Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1376 (N.D. Ga. 2004); see Halloum v. Intel Corp., ARB Case No. 04-068, 2006 WL 3246900, at *5 (ARB Jan. 31, 2006).

The "objective reasonableness" standard applicable to SOX whistleblower claims is similar to the "objective reasonableness" standard applicable to Title VII retaliation claims.[4] See Turner v. Baylor Richardson Med. Ctr., 476 F.3d

---

[4] We have previously declined to address whether the "reasonable belief" element of a Title VII retaliation claim includes both a subjective and objective component. Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 n.11 (5th Cir. Unit A Sept. 1981);

337, 348 (5th Cir. 2007) (holding that an employee need only show that she had a "reasonable belief that the employer was engaged in unlawful employment practices" to satisfy the "opposition requirement" of a Title VII retaliation claim) (internal quotation marks omitted). In Title VII retaliation cases, the objective reasonableness of an employee's belief can be decided as a matter of law in some cases. See Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427-28 (5th Cir. 2000). However, the objective reasonableness of an employee's belief cannot be decided as a matter of law if there is a genuine issue of material fact. See Long v. Eastfield Coll., 88 F.3d 300, 305 (5th Cir. 1996). If "[r]easonable minds could disagree on this issue," the objective reasonableness of an employee's belief should not be decided as a matter of law, and the fact-finder's resolution of the issue is entitled to deference on appeal. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1188 (11th Cir. 2001); see also Fine v. Ryan Int'l Airlines, 305 F.3d 746, 752-53 (7th Cir. 2002).

The ALJ in this case issued his recommended decision and order after a six-day hearing on the merits. The ALJ did not resolve the "objective reasonableness" issue through summary judgment because there was a genuine issue of material fact. See 29 C.F.R. § 18.40(d); Rollins v. Am. Airlines, Inc., ARB Case No. 04-140, 2007 WL 1031362, at *1 (ARB April 3, 2007); Carter v. Champion Bus, Inc., ARB Case No. 05-076, 2006 WL 3246909, at *3 (ARB Sept. 29, 2006). The ALJ determined that the Petitioners' beliefs were not objectively reasonable based on the evidence presented at the hearing. Because reasonable minds could disagree on this issue, the ALJ's factual finding regarding the "objective reasonableness" issue is entitled to deference under the substantial evidence standard. Consequently, we find that the ARB correctly reviewed the ALJ's "objective reasonableness" finding under the substantial evidence

---

see also Cartagena v. Aegis Mortgage Corp., No. 01-20324, 2001 WL 1268730, at *8 (5th Cir. Oct. 16, 2001).

standard, and we must apply the same deferential standard of review to that issue.

### 1. SAB-101 Problem

Waldon, who is a certified public accountant ("CPA"), argues that she reasonably believed that Stewart was violating an SEC rule or regulation when she expressed concerns to her supervisors that Stewart was not complying with SAB-101. Unlike a rule promulgated by the SEC pursuant to its ruling-making authority, see 15 U.S.C. § 78w(a), an SEC Staff Accounting Bulletin "does not carry with it the force of law."[5] See Ganino v. Citizens Utils. Co., 228 F.3d 154, 163 (2d Cir. 2000). SAB-101 was not a new accounting rule promulgated by the SEC; rather, the SEC staff issued SAB-101 "to guide companies in applying SEC Rules and GAAP to revenue recognition issues." Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 257 (5th Cir. 2005). To the extent that SAB-101 assists a company in complying with existing SEC financial reporting rules, an alleged SAB-101 violation could fall within the fifth enumerated category found in § 1514A. For instance, we have previously held that alleged SAB-101 violations in financial statements submitted to the SEC could survive a Rule 12(b)(6) motion to dismiss a Rule 10b-5 claim. Barrie, 397 F.3d at 257-58. However, by its own terms, SAB-101 applies only to revenue recognition in financial statements submitted to the SEC, which are available to shareholders, not to a company's internal financial documents. 1999 WL 1100908, at *1, *17-*18; see also Barrie, 397 F.3d at 257.

---

[5] SAB-101 states the following: "The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws." SAB-101, 71 S.E.C. Docket 590, 1999 WL 1100908, at *1(Dec. 3, 1999).

Regarding the SAB-101 compliance problem, the ARB found that substantial evidence supports the ALJ's factual finding that Waldon did not reasonably believe that Stewart was violating a rule or regulation of the SEC. Because reasonable minds could disagree on this issue, the substantial evidence standard applies, so we may not review this issue de novo, reweigh the evidence, or substitute our own opinion for that of the ALJ and the ARB. See Payne v. Weinberger, 480 F.2d 1006, 1007 (5th Cir. 1973). Based on the limited nature of Waldon's inquiry concerning the SAB-101 problem and her extensive accounting background, we concur with the ARB's holding that substantial evidence supports the ALJ's factual finding regarding the "objective reasonableness" issue.

Because she is a licensed CPA, the objective reasonableness of Waldon's belief must be evaluated from the perspective of an accounting expert.[6] Waldon knew that the internal consolidated financial statements for the Central Division, which she alleged did not comply with SAB-101, were not financial statements submitted to the SEC. Waldon testified that she knew these internal financial statements did not need to be SAB-101 compliant. Considering the fact that she is an accounting expert and Stewart's SEC statements were publicly available, Waldon could have ascertained whether Stewart's SEC statements failed to comply with SAB-101 and informed her supervisors of this fact, but she did not. Although Waldon apparently had subjective suspicions that Stewart's SEC statements might not be SAB-101 compliant based on her review of Stewart's 2003 internal financial statement, substantial evidence supports the ALJ's and ARB's factual finding that she did not sufficiently complain or raise particular concerns about whether Stewart's SEC statements were SAB-101compliant. Waldon's only direct complaint to her supervisors concerning

---

[6] Waldon has a Bachelor of Science degree in management accounting and has been licensed as a CPA since 1999.

15

SAB-101 compliance related to Stewart's 2003 internal financial statement, and substantial evidence supports the ALJ's and ARB's factual finding that she did not complain about SAB-101 compliance for fiscal years 2001 and 2002. We find that Waldon's general inquires concerning SAB-101 compliance in Stewart's internal financial documents, which she knew were not released to shareholders, do not constitute protected activity under SOX.[7] See, e.g., Bechtel Const. Co. v. Sec'y of Labor, 50 F.3d 926, 931 (11th Cir. 1995).

2. AS400 interest calculation, untimely refund, and POS billing problems

Allen, Breaux, and Waldon complained about the AS400 interest calculation, untimely refund, and POS billing problems to their supervisors. The Petitioners do not allege that Stewart's conduct regarding these three problems constituted mail fraud, wire fraud, bank fraud, securities fraud, or a violation of a specific SEC rule or regulation. Instead, the Petitioners simply argue that they "reasonably believed" that Stewart's conduct violated some unidentified federal law relating to fraud against shareholders. Thus, the Petitioners' complaints regarding these three problems must fall within the sixth enumerated category of protected activity, if any.

The Petitioners make two distinct but related arguments regarding why their complaints about the AS400 interest calculation, untimely refund, and POS billing problems constituted protected activity: (1) Stewart's financial condition would be negatively impacted by these three problems, which would adversely impact Stewart's shareholders; and (2) Stewart intentionally failed to disclose these three problems to its shareholders.

For purposes of the sixth enumerated category of protected activity, the plain language of the statute indicates that some form of scienter related to

---

[7] We express no opinion on whether Waldon's SAB-101 complaint would rise to the level of protected activity if made by a layperson without her extensive accounting knowledge.

fraud against shareholders is required.[8]  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976) (defining scienter in the securities fraud context as "a mental state embracing intent to deceive, manipulate, or defraud").  Mere negligence on the part of the employer does not constitute a violation of federal law relating to fraud against shareholders.  See id. at 199; see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504 (2007). In cases involving the sixth "catch-all" category, we conclude that the employee must reasonably believe that his or her employer acted with a mental state embracing intent to deceive, manipulate, or defraud its shareholders.  However, as stated previously, an employee's reasonable but mistaken belief that the employer violated some "provision of Federal law relating to fraud against the shareholders" is protected. See Halloum, 2006 WL 3246900, at *5.

We find that substantial evidence supports the ALJ's and ARB's factual finding that the Petitioners did not reasonably believe that Stewart acted with a "mental state embracing intent to deceive, manipulate, or defraud" in addressing the AS400 interest calculation, untimely refund, and POS billing problems.

---

[8] Because the issue is not before us, we express no opinion on whether the first five enumerated categories of protected activity found in § 1514A require some form of scienter related to fraud against shareholders.  Compare Reyna, 506 F. Supp. 2d at 1381-82 ("The statute clearly protects an employee against retaliation based upon that employee's reporting of mail fraud or wire fraud regardless of whether that fraud involves a shareholder of the company."), with Platone, 2006 WL 3246910, at *7 ("[W]hen allegations of mail or wire fraud arise under the employee protection provision of the Sarbanes-Oxley Act, the alleged fraudulent conduct must at least be of a type that would be adverse to investors' interests."). We note that several ALJs have held that fraud is an essential element of all whistleblower claims arising under § 1514A, which necessarily includes an element of intentional deceit. Gale v. World Fin. Group, ALJ Case No. 2006-SOX-43, 2006 WL 3246898, at *4 (ALJ June 9, 2006) (Romero, J.); Wengender v. Robert Half Int'l, Inc., ALJ Case No. 2005-SOX-59, 2006 WL 3246887, at *11 (ALJ March 30, 2006) (Kennington, J.); Marshall v. Northrup Gruman Synoptics, ALJ Case No. 2005-SOX-8, 2005 WL 4889013, at *3 (ALJ June 22, 2005) (Price, J.); Hopkins v. ATK Tactical Sys., ALJ Case No. 2004-SOX-19, slip op. at 6 (ALJ May 27, 2004) (Wood, J.).

The more difficult question is whether the Petitioners' complaint that Stewart intentionally failed to disclose these three problems falls within the sixth enumerated category of protected activity. Even assuming that Stewart's response to these unintended problems was merely negligent, the Petitioners argue that Stewart acted with fraudulent intent in failing to disclose these three problems to its shareholders. Being mindful of our deferential standard of review, we conclude that substantial evidence supports the ALJ's and ARB's factual finding that Stewart was attempting in good faith to correct these three problems and that Stewart did not intend to defraud its shareholders when it failed to disclose this information.[9]

### a. AS400 Problem

We find that substantial evidence supports the ALJ's and ARB's factual finding that the Petitioners did not reasonably believe that Stewart's delay in reprogramming the AS400 constituted a fraud on the shareholders. The Petitioners knew that the AS400 interest calculation problem was the direct result of unintentional computer programming errors that Stewart was

---

[9] We are troubled by the Petitioners' attempt to shoe-horn their complaint that Stewart intentionally failed to disclose these three problems into the sixth "catch-all" category of protected activity. It appears that this generic fraudulent omission claim is essentially a watered-down Rule 10b-5 claim. In cases involving an alleged fraudulent omission in violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, the objective reasonableness of the employee's belief is evaluated in part through reference to the elements of a Rule 10b-5 claim. See, e.g., Platone, 2006 WL 3246910, at *11 ("Platone's . . . allegation that ACA violated SEC Rule 10b-5 is baseless. Her revelations to Rodgers and others at ACA do not even approximate any of the basic elements of a claim of securities fraud—a material misrepresentation (or omission), scienter, a connection with the purchase, or sale of a security, reliance, economic loss and loss causation."); see also Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 382 (5th Cir. 2007) (regarding the elements of a Rule 10b-5 claim). Although an employee who makes a complaint concerning an alleged fraudulent omission does not need to prove that an actual violation of federal law occurred, the employee does need to prove that his or her belief was objectively reasonable under the circumstances. Because we conclude that substantial evidence supports the ALJ's and ARB's factual finding that Stewart did not act with fraudulent intent in failing to disclose these three problems to its shareholders, we need not decide whether the objective reasonableness of all generic fraudulent omission complaints must be evaluated in part through reference to the elements of a Rule 10b-5 claim.

attempting to correct. Stewart instructed its technology personnel to re-program the AS400 when it discovered the problem, and in the interim, Stewart's accounting personnel were performing manual amortizations of accounts as a temporary measure to ensure that payoffs were correctly calculated. Although the reprogramming of the AS400 failed during testing, substantial evidence indicates that Stewart attempted to remedy the problem in good faith.

Substantial evidence also supports the ALJ's and ARB's factual finding that Stewart was not attempting to conceal the AS400 problem. Stewart listed correcting the AS400 problem as a goal in the company's strategic plan for 2002-03, and this plan was distributed to team leaders, ground leaders, and QA representatives within the company. Furthermore, Stewart sponsored a conference in Dallas where QA Representatives addressed the problem openly with field personnel and paid for the attendees' travel and lodging expenses. Considering the fact that Stewart did not intentionally cause the AS400 problem, did not conceal it, and attempted to correct it, a reasonable person could conclude that Stewart's conduct regarding the AS400 problem did not violate some provision of federal law relating to fraud against shareholders.

b.     Untimely Refund Problem

The ALJ and ARB found that the Petitioners' complaints about delayed refunds did not constitute protected activity because they held that SOX does not provide protection for employees who report state law violations. See Williams v. Sirva, Inc., ALJ Case No. 2006-SOX-6, 2006 WL 3246817, at *2 (ALJ Feb. 13, 2006) (providing information to management concerning alleged violations of state law, standing alone, is not protected activity under SOX). We express no opinion on whether an employee's complaint regarding alleged violations of state law could constitute protected activity because substantial evidence supports the

ALJ's and ARB's factual finding that Stewart did not possess the requisite scienter regarding the untimely refund problem.[10]

The record indicates that Special Projects, which calculated refunds and payoffs, had a significant backlog and was attempting to remedy the problem. We agree with the ARB that substantial evidence supports the ALJ's factual finding that Stewart did not act with a mental state embracing intent to deceive, manipulate, or defraud its shareholders in addressing this refund backlog problem. Thus, the Petitioners' complaints regarding the untimely refunds do not fall within the six enumerated category of protected activity found in § 1514A.

c. POS Account Problem

The ARB found that substantial evidence supports the ALJ's factual finding that Breaux and Allen did not reasonably believe that Stewart was violating some provision of federal law relating to fraud against shareholders by issuing incorrect POS statements to its customers. We agree. Both Breaux and Allen knew that Stewart's customers were contractually obligated to pay any balance remaining when a third party refused to take responsibility for payment and that Stewart collected any remaining balances through its customer service office and outside collection agencies. Substantial evidence supports the ALJ's and ARB's factual finding that Stewart was not losing any money on its POS accounts and that Breaux and Allen could not reasonably believe that the incorrect POS statements adversely affected Stewart's shareholders. Breaux and Allen complained about Stewart's allegedly inadequate response to an unintended computer programming problem. Thus, substantial evidence supports the ALJ's and ARB's factual finding that Breaux and Allen did not

---

[10] Even assuming that a company's intentional failure to disclose alleged state law violations to it shareholders might constitute a violation of Section 10(b) and Rule 10b-5, that issue was not raised by the Petitioners, so we decline to address it.

engage in protected activity when they complained about the POS billing problem because Stewart did not possess the requisite scienter.

## III. Conclusion

The Petitioners have failed to establish the first element of their SOX whistleblower claims. Regarding the fifth enumerated category of protected activity, a reasonable person could conclude that Stewart did not violate a rule or regulation of the SEC because Waldon knew that Stewart's internal financial documents did not need to be SAB-101 compliant. Regarding the sixth enumerated category of protected activity, the Petitioners must reasonably believe that Stewart acted with a mental state embracing intent to deceive, manipulate, or defraud its shareholders. Stewart's unsuccessful attempts to remedy the AS400 interest calculation, untimely refund, and POS billing problems do not qualify as a fraud on the shareholders because Stewart did not possess the requisite scienter. A reasonable person could conclude that Stewart did not intentionally cause these three problems, did not conceal their existence, and attempted to remedy them. At most, Stewart inadequately responded to three unintended problems that arose in the regular course of business, and substantial evidence supports the ALJ's and ARB's factual finding that Stewart did not intend to defraud its shareholders in failing to disclose these problems. We decline to address the Petitioners' remaining arguments because we conclude that they did not engage in protected activity.

AFFIRMED.