Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge HILTON joined. Judge MICHAEL wrote a dissenting opinion.
OPINION
NIEMEYER, Circuit Judge:
Relying on the whistleblower protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, Mark Livingston commenced this action against his employer Wyeth, Inc., a pharmaceutical company, alleging that Wyeth unlawfully discharged him because of his complaints to Wyeth’s management about Wyeth’s inability to implement on schedule a training program at its Sanford, North Carolina facility, supposing therefore that local employees would likely misrepresent or cover up the deficiencies in progress to internal compliance auditors and to the Food and Drug Administration. The training program was designed to train employees in good manufacturing practices, and its implementation was required by regulations of the Food and Drug Administration. Livingston asserted that in making his complaints, he reasonably believed that Wyeth’s potential conduct in misrepresenting or covering up the deficiencies in timely implementation of the program would constitute violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b- *346 5 promulgated under it, and therefore that his conduct was protected under the Sar-banes-Oxley Act.
The district court entered summary judgment against Livingston, concluding that his complaints were not protected activity under the Sarbanes-Oxley Act because Livingston could not reasonably have believed that Wyeth was violating the securities laws. The court also concluded that Wyeth had shown, by clear and convincing evidence, that it had discharged Livingston for insubordination in threatening to have the police remove Wyeth’s Director of Human Resources from a company-sponsored holiday party and that Wyeth would have discharged Livingston regardless of whether he had complained about the progress of the training program.
Because we conclude that no objectively reasonable basis existed for Livingston to have believed that Wyeth was violating the securities laws, we affirm.
I
On Thursday, December 19, 2002, following a brief investigation, Mark Livingston was discharged from his employment with Wyeth as Associate Director of Training and Continuous Improvement at Wyeth’s Sanford, North Carolina facility. The parties agree that the precipitating events occurred on the previous Friday, December 13, 2002, when Livingston held a company-funded lunch party for members of the training staff. David McCuaig, the Director of Human Resources at the Sanford facility, came to the party without an invitation from Livingston, allegedly to wish the group a happy holiday. According to Livingston’s own testimony, Livingston approached McCuaig as McCuaig came into the room and asked, “What are you doing here? ... You’re not invited. We have a gift exchange. You have no gift. We have limited food.” After some more discussion, Livingston then stated, “I need you to leave. I’m asking you to leave. If you do not leave, I’m going to ask the police escorting holiday traffic downstairs ... to escort you out.” Although there is a factual dispute about the manner in which Livingston told McCuaig to leave, it is undisputed that he threatened to have the police remove him. Wyeth suspended Livingston on the following Monday, December 16, 2002, pending investigation, and, following a three-day investigation, it terminated his employment.
Wyeth contends that this incident was the culmination of a long history of abusive and insubordinate conduct by Livingston, about which he had been warned numerous times previously. Livingston contends, however, that he was fired in retaliation for complaining about the insufficient progress in implementing a training program to teach employees good manufacturing practices, as required by the Food and Drug Administration (“FDA”), and about the potential that Wyeth could misrepresent the progress of the program or cover up its true status, in violation of the securities laws.
Wyeth, Inc., formerly known as American Home Products Corporation, is a publicly traded company that develops pharmaceutical and consumer health products worldwide. Its net revenue in 2001 was approximately $14.1 billion. Its Sanford, North Carolina facility is one of more than two dozen at which it develops and manufactures products.
From August 2000 to December 2002, Mark Livingston was employed at the Sanford site, first as a manager of Training and Continuous Improvement, and then as Associate Director of Training and Continuous Improvement. He reported to Bruce *347 Kaylos, the managing director of the Sanford site. During the period of his employment, Livingston oversaw audits of training programs at the Sanford facility to monitor their progress. The events which form the basis of Livingston’s complaint in this case occurred during July and August 2002.
Wyeth’s manufacturing operations are regulated by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et. seq., and the FDA regulations promulgated thereunder. Pharmaceutical products, such as the vaccine components produced at the Sanford facility, must be made in accordance with “current good manufacturing practice.” 21 C.F.R. § 211.1. In addition to specific mandates, such as requiring workers to wear clean clothing during drug production, see id. § 211.28(a), the regulations for good manufacturing practices require that “[ejaeh person engaged in the manufacture ... of a drug product shall have education, training, and experience” sufficient to perform the functions assigned to them. Id. § 211.25. The regulations do not specify what training is required, how it should be accomplished, or how it must be documented, but rather leave it to each regulated company to create and implement appropriate procedures, subject to FDA inspection. If a pharmaceutical product is produced in a facility that does not adhere to good manufacturing practices, including training for good manufacturing practices, the product is legally considered adulterated and is subject to seizure by the FDA. See 21 U.S.C. §§ 351(a), 334(a)(1).
Precisely for this reason — a failure to follow good manufacturing practices — the FDA seized allegedly adulterated products at Wyeth’s Pearl River, New York and Marietta, Pennsylvania facilities, leading to a Consent Decree in October 2000, directed at those facilities. While the decree did not apply to any other facility, it did require Wyeth to retain an expert consultant to conduct a “division-wide” assessment of its quality control programs at all sites, including the Sanford site, and to respond to the expert’s report, providing the FDA with a timetable for its responsive actions. As required, Wyeth did retain a consultant and, in May 2001, advised the FDA that it would revise its training guidance documents, setting September 30, 2002, as the date by which it would implement training changes and verify compliance with the new program. The FDA has never suggested that Wyeth ever violated the October 2000 Consent Decree.
Wyeth’s training for good manufacturing practices at the Sanford facility required each manufacturing employee to have a “curriculum” of required training courses and a signed record to document the training. Beginning in 2002, these records were to be loaded into an electronic document control system known as ISOtrain. To transition to the new system, managers needed to be trained on the new system, curricula needed to be drafted, and forms and data for all employees needed to be entered into ISOtrain. As part of his job responsibilities, Livingston was designated to direct and oversee preparations for training system audits at the Sanford site between January 2001 and September 2002, which were to be conducted to monitor progress. For the period through June 2002, Livingston found no problem with the program’s progress. He advised management on May 22, 2002, that the Sanford facility remained “on track” for the September 30, 2002, implementation date.
Wyeth’s Office of Compliance scheduled the final internal verification of the new training system for July 29, 2002, two months before September 30, 2002, the date committed to the FDA. By July 9, *348 2002, Livingston became convinced that Wyeth could not meet this internal verification deadline, and he formally expressed his concerns in a July 10, 2002 memorandum to Kaylos and various corporate directors and managers. He stated in the memorandum that several departments of the Sanford site
require additional time to implement the initial components of the Wyeth Site Employee Training System. As well, we will need additional time to verify sustainable operation of a compliant training system in these areas. To indicate otherwise provides false and misleading information to outside auditors, including the FDA.
Kaylos did not receive the memorandum until approximately July 17, 2002, because he was on vacation. But he met with Livingston on July 24 to discuss the memorandum. Livingston states that at the meeting Kaylos threatened to fire him if he persisted in his criticism of the company’s compliance status and that Kaylos implied that Livingston should hide or “cover up” noncompliance issues from the Wyeth internal auditor. Livingston also acknowledges, however, that “[a]t no time during this meeting, did I claim that Kay-los and Wyeth were trying to mislead the FDA and those involved with the July 29 [internal] verification” audit.
Wyeth proceeded with the July 29 internal verification audit, and Marlene Raschi-atore of the Wyeth Office of Compliance, who conducted the audit, found the system to be satisfactory, noting that gaps in training documentation could be addressed in a “legacy plan.” A “legacy plan” is the means of closing compliance gaps after the target date for compliance passes. Livingston, who had drafted legacy plans in the past and was familiar with them, admits that he signed off on Raschiatore’s verification, but states that he did so on limited terms because, by then, he intended to file an ethics complaint based on the July 24 meeting with Kaylos.
On or around July 29, 2002, Livingston did file a formal complaint with Wyeth’s Office of Compliance, in which he stated that he had informed Kaylos of his belief that the Sanford site was not ready for the planned July 29 internal verification of the training system. As Livingston noted, “I expressed my concern that if we were to conduct the audit and not fully disclose the status of training system implementation at the site, [Wyeth] would be in the unfortunate position of providing false and misleading information to compliance auditors, including the FDA.” He further stated that Kaylos had “mocked and ridiculed” his analysis and that “[t]he underlying message from Mr. Kaylos was clear — we are going to conceal facts, data, and information from the verification auditor that would shine negatively on system implementation or operation at Sanford.” The complaint concluded:
Federal law deems it a crime to make any false, fictitious, or fraudulent statement to any government agency, or in making such statement, to conceal any material fact. As I read the Wyeth Code of Conduct, this policy is in place to ensure that information provided to government agencies is truthful, accurate, and complete.
Wyeth’s Office of Compliance conducted an investigation into Livingston’s complaint, but it found no violations by Kaylos or other Wyeth employees and closed its file on October 9, 2002.
The Sanford facility ultimately met the September 30, 2002 compliance target given to the FDA, and the Sanford site’s training system for good manufacturing practices received full verification by the Wyeth Office of Compliance. Livingston does not dispute that he signed the verifi *349 cation checklist certifying that the compliance deadline had been met.
On or around October 16, 2002, well after verification of the new training program was complete, the Human Resources director of the Sanford site, David McCuaig, placed Livingston on a Personal Improvement Plan (“PIP”) containing ten expectations. These included the specific requirements that Livingston stop making non-constructive comments, such as saying that the use of “approved and verified training practices is ‘defrauding’ the FDA,” and that he “[rjefrain from making negative and insulting comments regarding the practices of other departments.” The PIP stated that “[f]ailure to show immediate, significant and sustained improvement within the next 30 days will result in termination.” Livingston refused to sign the PIP.
The October 16 PIP was not the first run-in Livingston had with the Human Resources department. In 2001 and 2002, the Human Resources office had received numerous complaints from Wyeth employees about Livingston’s use of abusive language and inappropriate behavior. In May 2002, Livingston was formally warned for the use of “foul and abusive language and unprofessional behavior” toward subordinates. Livingston does not dispute that a number of employees asked for transfers or resigned as a result of his conduct.
Tension between Livingston and Kaylos and McCuaig continued to grow after the October 16 PIP, with Livingston becoming increasingly suspicious that he was about to be terminated. Livingston states that McCuaig “stalked” him at staff meetings and generally acted in a way that led Livingston to believe that he would be fired in front of his team members.
The situation came to a head on Friday, December 13, 2002, at the off-site Wyeth holiday party, when Livingston excluded McCuaig from the room in front of company employees. Wyeth in turn suspended Livingston the following Monday, December 16, pending investigation of the incident, and formally terminated him on December 19, 2002.
Livingston filed a “whistleblower retaliation” complaint with the Secretary of Labor on January 14, 2003. The Secretary issued preliminary findings against Livingston on June 27, 2003, but did not issue a final decision within 180 days, thus permitting a district court to obtain jurisdiction over the claim. Livingston commenced this action on September 29, 2003, naming Wyeth, Kaylos, and McCuaig as defendants. He alleged that the defendants (hereinafter collectively, “Wyeth”) violated 18 U.S.C. § 1514A, by taking adverse employment action against him in retaliation for expressing concerns about training at the Sanford facility, and violated North Carolina common law for wrongful discharge.
After the parties conducted discovery, the district court granted Wyeth’s motion for summary judgment, dismissing all counts of the complaint. Livingston v. Wyeth, Inc., No. 1:03CV00919, 2006 WL 2129794 at *15 (M.D.N.C. July 28, 2006). The court concluded that “[t]here [was] nothing in the record — or in Livingston’s allegations — indicating that Wyeth made false or misleading statements, or omitted relevant information, in any documents provided to its shareholders.” Id. at *10. Nor was there “an objectively reasonable basis, at the time of the allegedly protected activity, for Livingston to equate the perceived training deficiencies with imminent wrongdoing.... [T]he record is insufficient to support a finding that [Wyeth] appeared to be ready to commit wrongdoing.” Id. In addition, the court concluded that any wrongdoing hypothesized by Liv *350 ingston would, in any event, not have resulted in a “material” loss to Wyeth, requiring the loss to be reported publicly. Id. Finally, the court found “as a matter of law that [Wyeth] [had] established by clear and convincing evidence that a non-discriminatory rationale independently caused [Livingston’s] termination.” Id. at *11. The court observed:
Plaintiff, acting in front of subordinate employees, threatened to have a superi- or official removed from an office party by police officers who were nearby. Such an act of insubordination and insolence without question called for and supported Plaintiffs immediate termination, and Plaintiff was in fact suspended immediately and fired within six days on the basis of his actions at the holiday party.
Id. Consistent with these conclusions, the court also concluded that essential elements of Livingston’s wrongful discharge claim under North Carolina law were lacking. Id. at *12-15.
Livingston appeals the district court’s judgment, dated July 28, 2006, challenging each of the reasons given by the district court for granting Wyeth’s motion for summary judgment.
II
We review the district court’s grant of summary judgment in favor of Wyeth de novo. See Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir.2007).
To address Livingston’s claim, the factual essence of his claim must first be articulated.
Livingston rests his claim of retaliation on his complaints about Wyeth’s training program at the Sanford facility, principally communicated through two memoranda dated July 10 and July 29, 2002, but also through related oral conversations. In the July 10 memorandum, Livingston complained to management about “serious deficiencies” in the implementation of the training program for good manufacturing practices, observing that deadlines for completion of the training program were in jeopardy. He said, “We will need additional time to verify sustainable operation of a compliant training system in these areas. To indicate otherwise provides false and misleading information to outside auditors, including the FDA.” In the July 29 memorandum, which he submitted as a formal complaint in furtherance of his obligations as Associate Director of Training, he repeated that the Sanford facility “was not ready” for the planned July 29 internal audit to verify the necessary progress of the training program and to ensure that the September 30 deadline would be achieved. He warned that “if we were to conduct the audit and not fully disclose the status of training system implementation at [Sanford], [Wyeth] would be in the unfortunate position of providing false and misleading information to compliance auditors, including the FDA.” He added the admonition, “Federal law deems it a crime to make any false, fictitious, or fraudulent statement to any government agency, or in making such statement, to conceal any material fact.”
At no time did Livingston complain that Wyeth had in fact made a false statement to any government agency or to stockholders. And, as it turned out, Livingston’s fears went unrealized. He signed off on the internal verification audit that took place from July 29 to August 1, and on the implementation of the whole training program, which was completed by September 30, as committed, albeit with an agenda under a “legacy plan” to fill gaps. Nonetheless, in this action Livingston claims that his complaints to management were a contributing factor to his firing on Decern- *351 ber 19, 2002, and accordingly that Wyeth violated the whistleblowing provisions of the Sarbanes-Oxley Act insofar as it protects employees who make complaints about violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated under it, 17 C.F.R. § 240.10b-5.
Section 806 of the Sarbanes-Oxley Act of 2002, Pub.L. No. 107-204, 116 Stat. 745, 802-04 (2002), added § 1514A to Title 18 of the United States Code, providing “whistleblower” protection for employees of publicly-traded companies by prohibiting their employers from retaliating against them for providing information or cooperating in investigations related to violations of specified laws, including 18 U.S.C. § 1348 (prohibiting securities fraud) and Rule 10b-5 of the SEC (prohibiting the same), as well as any other provision of federal law relating to a company’s fraud against shareholders. Section 1514A provides, as relevant:
No [publicly-traded company], or any officer [or] employee ... of such company, may discharge ... or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee-
(1) to provide information ... regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to ...
(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).
18 U.S.C. § 1514A(a) (emphasis added). The burdens of proof for establishing a claim under § 1514A(a) are incorporated from the Whistleblower Protection Program of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub.L. No. 106-181, § 519(a), 114 Stat. 61, 145-49 (2000) (codified at 49 U.S.C. § 42121). See 18 U.S.C. § 1514A(b)(2)(C) (providing that the retaliation claim under Sarbanes-Oxley “shall be governed by the legal burdens of proof set forth in [49 U.S.C. § 42121(b) ]”). Section 42121(b), in turn, provides with respect to the burdens of proof that the plaintiff bears the burden of showing by a preponderance of the evidence that protected activity “was a contributing factor in the unfavorable personnel action alleged in the complaint.” 49 U.S.C. § 42121(b)(2)(B). If the plaintiff carries his burden, the employer may nonetheless defeat the plaintiffs claim for relief by showing “by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity].” Id.
Thus, for Livingston to establish a cause of action under 18 U.S.C. § 1514A, he must show, in the context of this case, by a preponderance of the evidence that (1) he provided information or a complaint to a Wyeth supervisor or to one authorized to investigate and correct misconduct; (2) the information or complaint regarded conduct that he reasonably believed constituted a violation of an enumerated statute or any regulation promulgated by the Securities and Exchange Commission relating to fraud;[1] (3) his employer discharged him *352 or took other unfavorable personnel action against him; and (4) his providing the information or making the complaint was a contributing factor to his discharge or other adverse employment action taken by Wyeth.
To “reasonably believe” that company conduct “constitutes a violation” of law, as those terms are used in § 1514A(a)(l), Livingston must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation. It would make no sense to allow Livingston to proceed if he himself did not hold the belief required by the statute, and the language of the statute itself requires that the belief be a “reasonable” one. 18 U.S.C. § 1514A(a)(l). Thus, § 1514A requires both a subjective belief and an objectively reasonable belief that the company’s conduct constitutes a violation of the relevant law.
Moreover, the statute requires Livingston to have held a reasonable belief about an existing violation, inasmuch as the violation requirement is stated in the present tense: a plaintiffs complaint must be “regarding any conduct which [he] reasonably believes constitutes a violation of [the relevant laws].” 18 U.S.C. § 1514A(a)(1) (emphasis added). In an analogous context, we have construed the reasonable belief of a violation to allow for a reasonable belief that the violation not only (1) “has happened” but also (2) “is in progress.” Jordan v. Alternative Resources Corp., 458 F.3d 332, 340-41 (4th Cir.2006) (construing the retaliation provision in Title VII, 42 U.S.C. § 2000e-3(a)), cert. denied, - U.S. -, 127 S.Ct. 2036, 167 L.Ed.2d 804 (2007). As we amplified in Jordan, “the employee must have an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes.” Id. at 341. We rejected the claim, however, that a reasonable belief that a violation has occurred or is in progress can include a belief that a violation is about to happen upon some future contingency. See id. at 340-41.[2]
Once Livingston establishes his cause of action, Wyeth can nonetheless defeat his claim for relief if it shows, by clear and convincing evidence, that it would have *353 taken the adverse employment action against him even in the absence of his providing the information or making the complaint. See 49 U.S.C. § 42121(b)(2)(B)(iv).
In this case, the district court concluded that Livingston failed to establish element (2) of his cause of action-that his complaint regarded company conduct that he reasonably believed constituted a violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 under it&emdash;and that Wyeth would have discharged Livingston even in the absence of Livingston’s having provided the information or made a complaint.
Addressing Livingston’s failure to establish element (2), we conclude that Livingston failed at several of the suppositional levels assumed by him to satisfy that element in the circumstances of this case. Livingston himself recognizes the speculative multi-step reasoning on which he must rely. As he asserts in his brief on appeal:
All that Livingston needs to show in order for his complaints and disclosure to enjoy protected activity status under Sarbanes-Oxley is a reasonable belief that Wyeth was violating “any rule or regulation” of the SEC, or “any provision of Federal law relating to fraud against shareholders.”
Pointing to the July 10 and July 29, 2002 memoranda, he states that “the core” of his complaints about violations of law was that:
Wyeth was intentionally concealing the same type of FDA [good manufacturing practices] violations that resulted in the consent decree [of October 3, 2000, covering two sites in Pennsylvania and New York] and ... this noncompliance would violate the consent decree and [good manufacturing practices] violations. Concealing consent decree and [good manufacturing practices] compliance violations, after having told the SEC and shareholders in its 2001 and 2002 [annual reports] and 10-Q filings that Wyeth was compliant with [good manufacturing practices] and consent decree requirements constituted a violation or apparent violation of Section 10(b) of the Exchange Act and Rule 10b-5.
In reaching this conclusion, however, Livingston has failed to detail numerous critical steps that he must, but cannot satisfy.
First, as of the date of the July 29, 2002 memorandum, and indeed as of anytime, Livingston failed to show that Wyeth misrepresented or concealed anything, and the July 29 memorandum did not complain of any misrepresentation or concealment. It expressed a “concern that if we were to conduct the audit and not fully disclose the status of training system implementation at [Sanford], [Wyeth] would be in the unfortunate position of providing false and misleading information to compliance auditors, including the FDA.” (Emphasis added). Livingston’s July 29 memorandum did draw the conclusion that he perceived Kaylos’ implicit message in their July 24 meeting to be that facts and data would be “covered up” from the Wyeth internal auditor and the FDA. Yet, the record is devoid of evidence that any Wyeth employee thereafter manifested even an intent to misrepresent facts or conceal any wrongdoing concerning training documentation. To the contrary, Livingston stated under oath that “[a]t no time during this [July 24] meeting, did I claim that Kaylos and Wyeth were trying to mislead the FDA and those involved with the July 29 verification.” Furthermore, he informed the Wyeth investigators who responded to his July 29 ethics complaint that he did not believe that anyone at the site would intentionally provide false statements, and a copy of the results of this investigation was actually provided to the Wyeth internal *354 auditor who conducted the July 29 inspection of the Sanford facility, negating any possibility that Livingston’s concerns could be “covered up” from the auditor. In addition, in order to anticipate a misrepresentation to the FDA, he would have to assume that the new training documentation system would not actually be implemented by the September 30 commitment date; that Wyeth would fail to develop an acceptable legacy plan to afford it additional time to close any remaining compliance gaps; and that Wyeth would then misrepresent or conceal the true status of the program. This chain of speculation is simply too long to support a claim that Wyeth in fact covered up anything and made misrepresentations to the FDA or was in the process of doing so, as is required to support a violation of the securities laws.
Second, just as the hypothetical misrepresentations of the program’s progress never occurred, so also no violation of the 2000 Consent Decree occurred. That decree, issued with respect to two plants in Pennsylvania and New York, was site-specific and did not cover the Sanford facility. The only way in which activities of the Sanford site could be implicated by the decree was the decree’s requirement that Wyeth “retain an expert consultant to undertake a division-wide assessment” of Wyeth’s quality control programs and to submit proposed responsive actions to the FDA, along with a timetable for completing those actions. But Wyeth concededly did those things. It retained an expert, and in response to the expert’s evaluation of the Sanford facility’s procedures, it committed to implementing a new training program for good manufacturing practices at the Sanford site by September 30, 2002. Thus, during the summer of 2002, when the training system implementation was in progress, there was no objectively reasonable basis from which to conclude that the 2000 Consent Decree had been or was being violated.
Third, there is no suggestion in either the July 10 or July 29 memorandum that Wyeth or its employees had or even intended to mislead shareholders, as necessary to support a reasonable belief that the securities laws had been or were being violated. The annual reports for 2001 and 2002, indicating that Wyeth was compliant with good manufacturing practices, was never shown to be false or misleading when made, and there is no indication in the record that Wyeth intended to make false or misleading statements about its manufacturing practices in the annual report that would come out in the spring of 2003. In addition, to convert a hypothesized cover-up and misrepresentation with respect to the progress of the training program at the Sanford site into a securities fraud violation would require even larger leaps of speculation than Livingston took in supposing misrepresentations to internal auditors and the FDA. In order to justify his belief that Wyeth committed securities fraud, Livingston would have to have reasonably believed that Wyeth (1) made a material misrepresentation (or omission) (2) with scienter (3) in connection with the purchase or sale of a security (4) on which the seller or purchaser reasonably relied, (5) causing economic loss. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); Miller v. Asensio & Co., Inc., 364 F.3d 223, 227 (4th Cir.2004). While Wyeth did state in its public reports for 2001 and 2002 that it was compliant with the 2000 Consent Decree (covering its Pennsylvania and New York sites and not its Sanford, North Carolina site), there is no evidence that that statement was false or misleading. And there was no statement, false or otherwise, about Wyeth’s training program implementation at the Sanford site. Indeed, Livingston’s *355 own observations indicate that no finding that Wyeth made a false or misleading statement would be possible, inasmuch as Livingston acknowledged that he never complained that Kaylos and Wyeth were “trying to mislead the FDA and those involved with the July 29 verification” and that he did not believe that anyone at the Sanford site would intentionally provide false statements. Nor was there any actual deficiency in implementing the training program that could be misrepresented or concealed. None of the fears expressed by Livingston in his July 10 and July 29 memoranda about false or misleading statements ever materialized. Thus, even though his claim requires that he have complained about what he believed as a past violation or one in progress, he cannot even point to evidence indicating that Wyeth intended to make false or misleading statements in any statement or report to shareholders. The chain of speculation, in light of a record totally devoid of any Wyeth wrongdoing at the Sanford site, is simply too weak on which to hang even a postulated violation of the securities laws. Livingston, therefore, could not have reasonably believed that Wyeth had violated or was violating the securities laws.
Fourth, even if Wyeth had made the false statements to compliance auditors and the FDA that Livingston supposed could be made, none would amount to a material statement as necessary to violate § 10(b) of the Securities Exchange Act and Rule 10b-5. For a statement or omission to be actionable under § 10(b) of the Securities Exchange Act and Rule 10b-5, it must concern a material fact. The Supreme Court has noted that to fulfill the materiality requirement, “there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.” Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted). Thus, for deficiencies in the training program schedule to have had a material impact on Wyeth’s finances, there must have been some realistic possibility that the FDA would take regulatory action against Wyeth having material financial consequences to a reasonable investor. It is undisputed, however, that the FDA never issued any warning or made any observation regarding Wyeth’s training schedule deficiencies at the Sanford site during the period when Livingston made his complaint.
Furthermore, at the time of Livingston’s alleged protected activity, Wyeth was developing pharmaceuticals at over two dozen facilities worldwide and had revenues of over $14 billion. The Sanford site alone had 27 different “quality elements” defined by its good manufacturing practices manual, of which the training about which Livingston complained was only one element. Livingston has not demonstrated why Wyeth would be obligated to report to investors as “material” any deficiencies in the training documentation procedures at a single site — or why he could “reasonably believe” that they must do so — particularly when the FDA was aware that Wyeth was taking steps to improve that procedure and before the FDA had in any way indicated it would take action, or even threatened such action. See Acito v. IMCERA Group, Inc., 47 F.3d 47, 52-53 (2d Cir.1995) (noting that failure to disclose negative results of FDA inspections of two plants was not material where defendant operated over 30 plants, the FDA had taken no materially adverse action, and the defendant had committed to correct plant deficiencies).
In sum, not one link in Livingston’s imaginary chain of horribles was real or was in the process of becoming real. The *356 only fact about which Livingston ever complained was the fact that the training system for good manufacturing practices was off schedule. And based on this one fact, he made a judgment that the program would not likely be ready for verification by internal compliance auditors on July 29 and would not be completed by September 30, 2002. Even this predictive judgment, however, proved to be wrong.
Thus, Livingston has failed to produce evidence that he provided information or made a complaint to Wyeth about conduct which a reasonable employee in his position could have believed at the time constituted a violation of the securities laws. And because we affirm the district court with respect to this element, we need not reach the other conclusions of the district court challenged by Livingston.
Ill
Livingston also contends that the district court erred in concluding that he had not established a claim for wrongful discharge under North Carolina common law. On appeal, however, Livingston’s entire argument is contained in a single sentence in his opening brief: “Because the district court’s findings of fact leading to dismissal of the federal claim are also the factual basis for dismissing the wrongful discharge claim, the latter dismissal was also in error.”
We agree with the district court that Livingston’s state law claim is unsupported in the record. He has presented no evidence that he was discharged on December 19, 2002, for refusing to violate the law or that he was fired for reporting the violation of a law expressing the public policy of North Carolina.
The judgment of the district court is accordingly

AFFIRMED.

. In § 1514A, the language defining the employee's belief of a violation includes a viola *352 tion of (1) 18 U.S.C. § 1341 (mail fraud); (2) 18 U.S.C. § 1343 (wire fraud); (3) 18 U.S.C. § 1344 (bank fraud); (4) 18 U.S.C. § 1348 (securities fraud); (5) "any rule or regulation of the Securities and Exchange Commission”; or (6) "any provision of Federal law relating to fraud against shareholders.” All except the violations described under (5) refer explicitly to a company’s fraud. We conclude that number (5) also refers to regulations prohibiting fraud. To conclude otherwise would absurdly allow a retaliation suit for an employee's complaints about administrative missteps or inadvertent omissions from filing statements. Moreover, the ambiguity is fully clarified by the context of the whistleblower provision in the Sarbanes-Oxley Act and by the legislative history that indicates that whistle-blowing is protected by § 1514A when it relates to "fraud.” See, e.g., S.Rep. No. 107-146, at 19 (2002) ("Although current law protects many government employees who act in the public interest by reporting wrongdoing, there is no similar protection for employees of publicly traded companies who blow the whistle on fraud and protect investors ") (emphasis added); id. (noting that whistleblower provision protects employees who report conduct "which they reasonably believe to be fraudulent") (emphasis added). In this case, Livingston relies on violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 under it, both of which prohibit securities fraud.

. As we noted in Jordan, because this analysis for determining whether an employee reasonably believes a law is being violated is an objective one, we resolve the question as a matter of law. Jordan, 458 F.3d at 339.