In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1445

MARY L. HARP,

*Plaintiff-Appellant,*

*v.*

CHARTER COMMUNICATIONS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 04 C 951—**Michael J. Reagan**, *Judge.*

ARGUED JANUARY 17, 2008—DECIDED MARCH 16, 2009

Before RIPPLE, ROVNER, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Plaintiff-Appellant Mary Harp was an employee at Charter Communications, Inc., which held the cable franchise for the City of St. Louis and surrounding areas, including parts of southern Illinois. In February 2004, she was terminated as part of a reduction in force ("RIF") that resulted in the loss of employment for approximately 50 people. At the time, she was the supervisor for the Technical Audit Department for the St. Louis marketing area, and the entire audit depart-

ment was eliminated as part of the RIF. Harp sub-
sequently brought this action, alleging that her termina-
tion was in retaliation for her whistleblowing activities
as an employee of Charter, in violation of the Sarbanes-
Oxley Act. *See* 18 U.S.C. § 1514A(a). Harp asserts that
she reported, within the proper channels in the company,
that payments were being authorized to a contractor
for work that was not performed. The district court
granted judgment in favor of Charter, and Harp appealed.

Section 1514A(a) of the Sarbanes-Oxley Act provides
whistleblower protection for employees of publicly-traded
companies by prohibiting employers from retaliating
against them for "any lawful act done by the employee . . .
to provide information, cause information to be pro-
vided, or otherwise assist in an investigation regarding
any conduct which the employee reasonably believes
constitutes" mail fraud, bank fraud, securities fraud, or
violation of any rule or regulation of the SEC, or any
federal law relating to fraud against shareholders, when
the information or assistance is provided to a person
with investigatory authority. 18 U.S.C. § 1514A(a). That
provision adopts the burden-shifting framework ap-
plicable to whistleblower claims brought under the
Wendell H. Ford Aviation Investment and Reform Act for
the 21st Century, 49 U.S.C. § 42121(b) (2000), and the
relevant burdens of proof are set forth in 29 C.F.R.
§ 1980.104(b)(1) (2007) and numerous court opinions:

> To prevail under this provision, an employee must
> prove by a preponderance of the evidence that (1) she
> engaged in protected activity; (2) the employer knew

that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. . . . If the employee established these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior."

*Allen v. Administrative Review Board*, 514 F.3d 468, 475-76 (5th Cir. 2008); *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 351 (4th Cir. 2008); *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008); 18 U.S.C. § 1514A(b)(2)(C); 49 U.S.C. § 42121. The Act requires that the employee "reasonably" believe in the unlawfulness of the employer's actions. We agree with the courts that have held that the reasonableness must be scrutinized under both a subjective and objective standard, and in fact the parties do not argue that we should depart from that interpretation. *See Day v. Staples*, 555 F.3d 42, 54 (1st Cir. 2009); *Livingston*, 520 F.3d at 352; *Allen*, 514 F.3d at 477. Therefore, Harp must actually have possessed that belief, and that belief must be objectively reasonable. Objective reasonableness "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Allen*, 514 F.3d at 477.

Harp's claim of retaliation rests on her belief that Barry Wilson, her supervisor and the Senior General Manager of the St. Louis Key Marketing Area ("KMA") at

Charter, authorized payments to a contractor, MSTA[1], for work that MSTA had not in fact performed under its contract with the company. The genesis of this claim is somewhat convoluted, but will be briefly described insofar as it is relevant to the particular claim before us.

Charter's Technical Audit Department was responsible for conducting house-to-house audits to determine whether households were unlawfully obtaining cable services. The audits were performed both internally and through the use of outside contractors. Charter contracted with MSTA to perform certain auditing services required for Charter's business. Those services included visiting the homes of non-subscribers to determine whether they had access to cable for which they were not paying. MSTA claimed that the contract also directed it to visit the homes of subscribers to ensure that they were only receiving the cable services for which they paid. Charter, and particularly Harp, disputed that the contract included payment for visiting the homes of subscribers. As part of her job as supervisor of the Technical Audit Department, Harp was responsible for ensuring that MSTA performed the services for which it sought payment. Harp determined that MSTA was seeking payments for services that it either had not performed, or for services not authorized by the contract.

By Harp's own admission, her supervisor Barry Wilson was initially receptive to Harp's complaint as to MSTA's

---

[1] "MSTA" does not appear to be an acronym, as the parties and the court refer to this company simply as MSTA or MSTA, Inc.

billing practices. Wilson acknowledged that MSTA was notorious for improper billing, encouraged Harp to look for proof of falsification, and instructed her to meet with Charter's in-house counsel, Hunt Brown. Harp agrees that those actions by Wilson support an inference that Wilson was taking MSTA's fraudulent billing seriously. On January 12, 2004, Wilson assembled a meeting which included Harp, Wilson, Tom Baker, and a representative from MSTA. The meeting devolved into accusations by Harp of discrepancies in the services performed and the invoices submitted by MSTA—with specific documentation of problems—and MSTA's denials and challenges to those positions. Although Harp was prepared with specific examples of improper billings by MSTA, she did not have a summary of numbers that she believed were proper or figures that would represent a just resolution of the matter. Ultimately, Wilson abruptly terminated the meeting. It is that action, and the directive given by Wilson at that time, that forms the crux of Harp's allegation here.

According to Harp, in summarily terminating the meeting, Wilson "rescued MSTA's representatives" from having to answer direct questions about their wrongdoings. Harp then asserts that at the close of that meeting, Wilson directed Baker to pay MSTA the full contract amount. On appeal, Harp's allegation of fraud relies specifically on that alleged directive to pay the full amount, as she states in her reply brief:

> Wilson abruptly ended the meeting and ordered Tom Baker to pay MSTA the full contract amount (App. 997;

956, p. 315), not a negotiated amount, which would have been more suggestive of the inference Charter asks the court to draw, i.e. that Harp could have viewed Barry Wilson's conduct only as a legitimate negotiated settlement.

Reply Brief at 3. Harp further noted that prior to that meeting, she had reported directly to Wilson as her immediate supervisor, but that a restructuring was implemented that interposed Baker between herself and Wilson in the command chain. She maintains that the sudden inclusion of Baker was a means of avoiding Harp, in that Wilson could then instruct Baker to pay the entire contract amount. After that January 12th meeting, Harp spoke with the contract administrator, Mary Capstick, and informed her that Wilson had assigned the project to Tom Baker to get together with MSTA and determine how much Charter would have to pay to "make the matter go away." Two days later, Harp filed an oral report with Brooke Wilson, who was authorized to handle such complaints, alleging that Barry Wilson's conduct violated Charter's ethics code.

Harp's claim therefore rests on the apparent change of heart by Wilson as evidenced in that January 12th meeting, and Harp's subsequent reporting of the alleged misconduct through the proper investigatory channels at the company. We note initially that although the testimony is that Harp reported a violation of the code of ethics, as opposed to a violation of federal laws, the critical focus is on whether the employee reported specific conduct that constituted a violation of federal

law, not whether the employee correctly identified that law. *See Welch*, 536 F.3d at 276. If the specific conduct reported was violative of federal law, the report would be sufficient to trigger Sarbanes-Oxley protection even if the employee did not identify the appropriate federal law by name. *Id.*

The problem with Harp's case, however, is that the record does not support Harp's characterization of that January 12th meeting. Specifically, the record does not indicate that Wilson ordered payment of the full amount to MSTA, or even that he ordered payments of any amounts not properly earned. In the deposition testimony upon which she relies for this point, Harp does not recite any statements by Wilson. Instead, Harp relates a conversation with Baker, in which she asks him what he thinks Wilson intended after ending the meeting. Baker replied that with respect to the invoices, "he had accrued for them, so he thought they were going to be paid." When Harp was then asked if she knew what amount accrued, and whether it was the excess amounts she did not authorize, Harp replied that she did not know. Therefore, Harp's allegation of fraud in this case rests on a conversation with Baker in which she attempts to divine Wilson's intent in paying the invoices, and in which Baker states that he thinks that the accrued amount is to be paid.

Harp acknowledges that she does not know if that "accrued" amount was more than the amount she had determined was properly earned by MSTA. Those statements are far too ambiguous to support an objectively

reasonable belief that a fraudulent payment had been ordered by Wilson. This is particularly true given that Wilson's conduct to that point had been to support Harp in her investigation of MSTA and to include her in the meeting which sought to address the payments to MSTA. Finally, that characterization of the January 12th meeting is contradicted by Harp herself. In Plaintiff's Supplemental Response to Defendant's First Interrogatories, Harp states that Wilson had stopped the meeting and assigned to Baker the job of meeting with MSTA and determining what amount would have to be paid to "make the matter go away." That is different than stating that Charter should pay MSTA the entire amount requested, and instead reflects a decision to meet with MSTA concerning the disputed amount to come to a resolution. In fact, Harp's complaint of unethical conduct, which forms the basis for her Sarbanes-Oxley claim, refers only to Wilson's desire to achieve a negotiated settlement, not an authorization to pay the full amount. The record contains the written copy of that complaint, and she alleges only that it was a breach of ethics for Wilson to end the meeting and to "seek a speedy resolution of the MSTA billing problems for the sake of putting this behind us," and to "come to a negotiated settlement above that which is approved for payment." Harp, then, was concerned that MSTA would be paid more than it had earned, but she clearly contemplated future not present action in paying MSTA. Her complaint itself speaks in terms of a negotiated settlement, and there is no evidence that any such settlement figure had been reached at that time.

Therefore, there was no basis, subjective or objective, for Harp to conclude at that time that Wilson had authorized full payment. On appeal, Harp does not argue that Wilson was engaging in fraud in attempting to negotiate a settlement. In fact, she argues that Wilson ordered payment of the full amount—not a negotiated amount which, according to Harp, would have reflected a legitimate attempt to resolve the issue. We have no need to consider whether efforts to pursue a negotiated settlement at such an early stage as was present here can ever give rise to an objectively-reasonable belief that a fraud was being committed, because that is not argued here.

The conclusion that Harp did not reasonably believe a fraud was being committed is further buttressed by Wilson's subsequent actions in the case. After the January 12th meeting, Harp continued to investigate MSTA, and no amounts were paid without Harp's authorization. Full payment was not in fact made to MSTA after that meeting, and in fact was never made. Instead, the amounts paid to MSTA reflected the amounts approved by Harp as earned by MSTA. Moreover, after the January 12th meeting, Harp sent an e-mail to Wilson regarding the meeting and making clear that she did not believe that MSTA should be paid any more than it was owed. Wilson responded by e-mail indicating that he terminated the meeting because he did not want to continue in a he-said/she-said fashion, and that he had no qualms supporting Harp as they moved forward with the MSTA matter. He further stated that it was important to document their claims in an

unequivocal fashion, and declared that "[u]nder no circumstances will we pay them for work not done." In Plaintiff's Response to Defendant's First Request to Admit, Harp acknowledges that no one at Charter ever told her to stop investigating the billing issues with MSTA, and that Wilson never told her that MSTA should be paid for work that MSTA did not do. In light of the sequence of events set forth by Harp herself in written statements and deposition testimony, there is simply no objective basis for Harp to have believed that fraudulent payments were authorized on January 12th, or at a later date for that matter. That is the only fraud that is before the court today under the Sarbanes-Oxley Act.

We note that Harp in the opening brief expounds at length on Charter's allegedly improper use of MSTA, which was a minority-owned business, to meet the City of St Louis' minority set-aside goals, while allowing MSTA to subcontract much of the work to non-minority firms. Harp acknowledges that she was unaware of any of that history at the time of the incidents at issue here, and in any event those facts point to fraud on the City, not the shareholders, and that was not the fraud reported within the company nor is it the basis for the Sarbanes-Oxley challenge. Therefore, those facts are irrelevant to the issues before us.

Because Harp has failed to establish the first prong of the test, she cannot succeed in her Sarbanes-Oxley challenge. Even were she to succeed in that hurdle, however, her claim could not succeed on the record before us. Harp has the burden of establishing by a preponderance of the

evidence that her report of the alleged misconduct was a contributing factor in her termination. And if she met that burden, Charter could nonetheless prevail by establishing through clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior. *Allen*, 514 F.3d at 475-76; *Livingston*, 520 F.3d at 351. The circumstances of the termination would make those steps insurmountable for Harp.

Harp's entire department, the Technical Audit Department, was eliminated as part of the RIF. In addition, approximately 25 other persons at Charter were laid off. The uncontradicted evidence in the record is that Charter's St. Louis KMA did not achieve its budget revenues for January 2004. As a result of it falling short in its revenue collected, it also missed its cash flow. Because this occurred in the first month of the year, the impact on the budget would be significant in each of the succeeding months if not corrected immediately. Accordingly Wilson was instructed by Charter's Executive Vice President for the Midwest Division and its Chief Operating Officer to correct the problem as soon as possible. Because it takes time to rebuild revenue, Wilson was instructed to move quickly to reduce expenses. A decision was made to terminate approximately 50 full-time positions, and in order to minimize adverse impact on revenue generated by customers, it was decided that those positions should be the ones least related to customer recruitment and retention. Therefore, departments such as marketing and service were not targeted, but the audit department was eliminated—with the audit

functions taken over by the department in charge of quality control. As Harp acknowledged in her deposition, that was not the first time in which the company would not have a dedicated group of individuals assigned to auditing; in the past, the job had been done at times by technicians who would look for violations in the course of their work. Harp has presented no evidence that Charter was not in financial trouble, or that the audit department was selected for other, nefarious reasons. Nor does she present evidence that any significant number of the employees subjected to the RIF were rehired shortly, which would also be suggestive that the RIF was not what it appeared to be. Instead, Harp focuses on minor discrepancies in testimony as to when the directive was issued that required the drastic improvements in the financial situation. Differences such as whether a directive was made in early or late January or February, and as to whether the budget cuts had to show general improvement or meet a specific monetary target, are ancillary to the issue, which was whether the cuts were required by the financial situation of the company and the departments and individuals chosen were dictated by those financial considerations. Harp does not contest that Charter's St. Louis KMA substantially missed its January 2004 budget, that remedial action was ordered, and that the audit department had the least direct impact on the recruitment and retention of customers.

Harp simply has no evidence indicating that her termination was attributable to something other than the financial problems that necessitated the RIF. She relies

entirely on the timing of the RIF, which is concededly proximate to the MSTA issues, but is also temporally tied to St Louis KMA's failure to make its budget which Harp does not contest. Harp analyzes the temporal proximity issue as if she were the only person subjected to the RIF, in which case the timing might suggest that the allegation of misconduct played a role. But the sheer scope of the RIF is relevant to what inference may reasonably be drawn. Harp points to evidence that the employer may have wanted to retaliate for her report of misconduct, and the ambiguity as to when the financial directive was issued, as evidence that "the entire reduction of force was a ruse." It is simply not a reasonable inference that despite the need to address the budget shortfalls, the RIF was actually an effort to retaliate against her for her complaint. The jury would have to conclude that in an effort to cover up the retaliatory action against Harp, Charter laid off the entire audit department as well as approximately 25 other individuals in other departments. If the motive was to terminate Harp, merely eliminating the audit department would seemingly be enough to characterize it as a RIF, but that represented only half of the total employees laid off. Moreover, Harp argues that the RIF could not have been motivated by the need for substantial financial gains because the savings from the RIF were offset by the severance payments. The savings from laying off approximately 50 employees are not rendered a nullity from a budget perspective by the inclusion of a one-time payment to those employees, as the relevant focus is on the longer-term impact on revenues and expenses. There

is simply no reasonable basis for a jury to believe what is ultimately mere speculation.

Harp additionally challenges the district court's discovery rulings, but we find no abuse of discretion there. Accordingly, the decision of the district court is AFFIRMED.

TINDER, *Circuit Judge*, dissenting. My colleagues correctly identify the two contested areas in this case— whether the plaintiff engaged in protected activity and whether that activity was a contributing factor in the unfavorable personnel action she suffered. I have no quarrel with the legal parameters well laid out in the majority opinion. However, because there are several factual matters that are sufficiently contested to warrant, in my opinion, determination by a jury, I cannot join in the majority opinion.

This seems to me to be a very close case that vividly illustrates the dilemma facing an employee who thinks she may be able to stop a fraud from occurring. Employees who catch corporate misconduct in its formative stages are protected by the language and purpose of Sarbanes-Oxley (SOX). Yet, raising concerns before questionable practices are entirely resolved can be very awkward. An

employee with a reasonable belief that she has detected corporate fraud as it is underway should not be discouraged from reporting it. Such a belief must be grounded in facts known to the employee, but the employer's response to a disclosure of those facts may be suspicious enough to add support to a reasonable belief that fraud is afoot. The employee should not have to wait until the fraud has been accomplished to register a concern.

The majority concludes that Charter's reduction-in-force demonstrates that Harp's employment with Charter ended because of Charter's financial woes, not because of her expressed concerns about the MSTA matter. At the outset, I agree that Harp's view that the RIF was merely cover for retaliation against her appears, at least initially, highly implausible and perhaps, even, almost narcissistic. The notion that the firing of 49 other people and the elimination of an entire department was nothing more than an excuse for retaliation against Harp is difficult to swallow. But, despite the fact that the inference she asks us to adopt is at first blush implausible, she has offered enough evidence to be taken seriously. Charter may want us to assume that just because a RIF is sizeable, there is no way that retaliation could be concealed within it. However, as the facts about Harp's complaint and the RIF are peeled back a bit, Harp's assertion becomes more plausible, and merits the evaluation of a jury.

The evidence before us shows that the plaintiff was aware and upset about a very specific issue—that MSTA was apparently going to be paid after fraudulently overbilling her company. But after the plaintiff was terminated

she became aware that the issue she had complained of was part of a larger scheme with more significant consequences than she realized at the time. It seems to me that Mary Harp, when confronted with what she perceived as fraud, took exactly the steps that SOX encourages. She submitted a formal complaint and several informal complaints about the decision by her supervisor to pay MSTA for work it had submitted under what Harp believed were fraudulent invoices.

The circumstances under which she submitted the complaint are important to consider. Charter's HR manager, Brooke Wilson, strongly discouraged Harp from making a complaint and refused to accept a written form of the complaint. So, Harp read it to her. Brooke then told Harp that a formal complaint would cause trouble and intimated that despite the law, retaliation could be in the offing. According to Harp, Brooke said, "I mean, there is going to be an investigation, I mean, there is not *supposed* to be retaliation, but there is going to be an investigation and nobody is 100 percent, and it's going to get ugly." Harp testified that Brooke emphasized the word "supposed" and that she, Harp, inferred from that emphasis that she could be retaliated against for filing the complaint.

Harp persevered with her complaint, however, alleging that the decision to pay MSTA was a fraud on the shareholders. There really is no dispute that when she submitted the complaint, Harp subjectively believed that she had identified fraud. She spent months documenting what she thought were approximately $500,000 worth of

fraudulent bills. When a meeting was scheduled to discuss her findings, she was fully prepared to confront MSTA with her evidence. However, Barry Wilson abruptly truncated the meeting and directed Tom Baker to make the matter go away. When she discussed what Barry meant with Baker, he told Harp that he believed he was supposed to pay the accrued amount and that he had "accrued for that whole amount."

My colleagues correctly point out that, for whatever reason, Harp has chosen to make her stand on her belief that she had been ordered to pay the full amount. But I don't think this view is the death knell for her claim. Her complaint to management did mention a "negotiated settlement" and "speedy resolution" to MSTA's claim. But Harp's contemporaneous notes and deposition testimony indicate that she believed Baker (who, by the way, was inserted between Harp and Wilson's direct supervision on January 7, just five days before the meeting at issue) had been ordered to pay the whole amount. Unlike my colleagues, I believe that the discrepancy between Harp's complaint and her testimony is reconcilable.

As of the January meeting, Harp had identified invoices filled out by bogus MSTA employees, fictitious addresses being audited, unnecessary audits done for existing customers and other practices she felt were improper (including, in one instance, a billing for purported audits of more houses than actually existed in one zip code.) She was certain that Charter was a victim of fraud and it was inexplicable to her that an officer of the com-

pany would offer to pay MSTA in the face of these prac-
tices. Subsequent events may or may not have disabused
her of the notion but I would note that most of the over-
tures subsequent to the meeting suggesting further in-
vestigation of MSTA were made after Harp's super-
visors became aware of her complaint.

So, when she made her complaint, it appears to me
that she reasonably believed, both subjectively and objec-
tively, that she had been called off the hunt, that her
documented findings of fraud were being swept under
the rug, and that Barry Wilson had ordered MSTA to be
paid in full.

As for the termination of Harp's employment, several
factors lead me to think that the jury could reasonably
draw an inference of retaliation. First, the timing of
Harp's firing, while not dispositive, is close enough to
her struggles with her supervisor and ensuing complaint
to encourage a closer look at her claim. The RIF took place
on February 25, 2004—six weeks after the crucial meeting
between Harp and MSTA. Charter admits that the RIF
decision was made sometime in January 2004 but argues
that it was made in response to an unexpected January
2004 budgetary shortfall.

Although it is undisputed that Charter faced a bud-
getary shortfall in January 2004, it is disputed whether
the measures Charter took could have substantially
ameliorated the shortfall. For instance, Charter execu-
tives testified that they needed to save $800,000
per month to make up the shortfall. Harp has offered
evidence that the monthly salaries of those let go was
just about $167,000—and that the anticipated cost of

discharge for the employees was almost $200,000 given their severance packages. Harp's calculations show that the RIF, which Charter executives testified was the sole cost-savings measure undertaken in response to the budget shortfall, came nowhere near accomplishing its purported goal of saving $800,000 a month. In response, Charter merely offers Barry Wilson's testimony that the company needed to save $800,000 per month as evidence that there were, in fact, cost savings sufficient to meet the asserted purpose of the RIF. Charter concedes that it has no evidence as to whether the RIF accomplished its apparent purpose.

It is also undisputed that as part of her termination, Harp received a severance form that indicated that she was not eligible for rehire. That designation alone sure doesn't sound like a typical RIF. Charter argued (but did not support in the summary judgment record) that all RIF'd employees were eligible for rehire and that the designation of any of them as ineligible was simply a "mistake." But Charter failed to present any evidence that the "mistake" was ever corrected, and certainly not as to Mary Harp. Furthermore, two months after the RIF, Charter began rehiring for the technical audit department (without rehiring Harp). The rehire was set in motion on March 17, 2004, seven days after Charter's dispute with MSTA was settled.

Finally, Harp offered significant evidence that MSTA was a front company used by Charter to fulfill minority contracting requirements as part of its city-granted franchise in St. Louis's cable market. In fact, Harp's summary

judgment submission includes an e-mail that shows her threats to pull the plug on MSTA triggered concerns within Charter that the St. Louis franchise might be lost because MSTA's status as a front company would be exposed.

While my colleagues are correct that this last item is irrelevant to the issue of whether Harp's complaint was SOX-protected activity, this evidence is very relevant to the retaliation prong of the inquiry. Specifically, the consequences of Harp's aggressive posture to MSTA's fraudulent billing could have resulted in the termination of Charter's franchise in St. Louis and brought to an end a major source of revenue for the company. The gravity of these consequences makes the idea that Ms. Harp was included in a RIF because of her complaint a little more palatable. This is especially true when you consider that the RIF eliminated the entire Technical Audit Department, the pesky unit that would be likely to uncover such untidy problems with MSTA.

Ultimately, despite the fact that others were let go at the same time as Harp, the critical question is whether Harp has offered sufficient evidence to prove that her protected complaint contributed to her termination. I believe she has. The facts at the summary judgment stage lead me to three possible conclusions about Charter's RIF—it was necessary to cut costs, it covered retaliation against Harp or it was designed to eliminate an entire department that had recently become troublesome. On the record before us, I think the facts can reasonably be construed to support any of those three motivations. Therefore, summary judgment was inappropriate.

I think that Harp has presented enough to allow a jury to find that she has proven the four elements required of a plaintiff under Section 1514A(a), and that Charter should be put to the test of proving by clear and convincing evidence that her termination would have occurred regardless of her MSTA complaint. I respectfully dissent.